# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

**UNITED STATES OF AMERICA**

v.

Arman GRIGORYAN ("A. GRIGORYAN"),
Lianna 'Lili' OVSEPIAN ("L. OVSEPIAN"),
Kenneth Wayne JOHNSON, M.D. ("JOHNSON"),
Nurista 'Nora' GRIGORYAN ("N. GRIGORYAN"),
Phic "PK" LIM ("LIM"),
Theana KHOU ("KHOU"),
Edgar HOVANNISYAN ("HOVANNISYAN")
Artur HARUTYUNYAN ("HARUTYUNYAN"),
Mikayel GHUKASYAN ("GHUKASYAN"),
Artak OVSEPIAN ("Artak OVSEPIAN"),
Artyom YEGHIAZARYAN ("YEGHIAZARYAN"),
Samvel TAMAZYAN ("TAMAZYAN"),
Nune OVSEPYAN ("N. OVSEPYAN"),
Lisa D. 'Danielle' MENDEZ ("MENDEZ"),
Anthony Glen JONES ("JONES"),
David 'Green Eyes' SMITH ("SMITH"),
Richard Bond WASHINGTON ("WASHINGTON")

DOCKET NO.

MAGISTRATE'S CASE NO.

11- **11-2474M**



FILED
CLERK, U.S. DISTRICT COURT

OCT 25 2011

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Complaint for violation of Title 18, United States Code § 1349

| NAME OF MAGISTRATE JUDGE<br>CARLA WOEHRLE | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br>Beginning in on a date unknown and continuing until on or about October 27, 2011 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

### SEE ATTACHMENT

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge.   /S/ | SIGNATURE OF COMPLAINANT<br>LAURA WILBUR   /S/ |
|---|---|
| | OFFICIAL TITLE<br>SPECIAL AGENT -- California Department of Justice |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)   CARLA M. WOEHRLE | DATE<br>October 25, 2011 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

JLW:BRB        REC: ARREST WARRANT /DETENTION (all defendants)

# ATTACHMENT

Beginning in on a date unknown and continuing until on or about October 27, 2011, within the Central District of California and elsewhere, defendants Arman GRIGORYAN ("A.GRIGORYAN"), Lianna 'Lili' OVSEPIAN ("L.OVSEPIAN"), Kenneth Wayne JOHNSON, M.D. ("JOHNSON"), Nurista 'Nora' GRIGORYAN ("N.GRIGORYAN"), Phic "PK" LIM ("LIM"), Theana KHOU ("KHOU"), Edgar HOVANNISYAN ("HOVANNISYAN"), Artur HARUTYUNYAN ("HARUTYUNYAN"), Mikayel GHUKASYAN ("GHUKASYAN"), Artak OVSEPIAN ("Artak OVSEPIAN"), Artyom YEGHIAZARYAN ("YEGHIAZARYAN"), Samvel TAMAZYAN ("TAMAZYAN"), Nune OVSEPYAN ("N.OVSEPYAN"), Lisa D. 'Danielle' MENDEZ ("MENDEZ"), Anthony Glen JONES ("JONES"), David 'Green Eyes' SMITH ("SMITH"), Richard Bond WASHINGTON ("WASHINGTON"), and others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to execute a scheme to defraud a health care benefit program, namely Medicare and Medi-Cal, in violation of 18 U.S.C. § 1349.

## TABLE OF CONTENTS

PAGE(S)

I.    Introduction . . . . . . . . . . . . . . . . . . . 1

II.   Summary of Criminal Scheme . . . . . . . . . . . . 3

    A.  Scheme Participants and Execution . . . . . . . 4

    B.  Scope of the Scheme . . . . . . . . . . . . . . 7

III.  Purpose of Affidavit (Search and Arrest Warrants) . . . . 9

IV.   Items to be Seized . . . . . . . . . . . . . . . 10

V.    Overview of Healthcare Programs & Relevant Drugs . . . 11

    A.  Medicare . . . . . . . . . . . . . . . . . . . 11

        (1) Medicare Part B . . . . . . . . . . . . . 11

        (2) Medicare Part D . . . . . . . . . . . . . 12

    B.  Medi-Cal . . . . . . . . . . . . . . . . . . . 13

    C.  Pharmaceutical Drugs at Issue in this Investigation   14

VI.  Statement of Probable Cause . . . . . . . . . . . . 16

    A.  Initiation of Investigation . . . . . . . . . . 16

        (1) Detection and Initial Surveillance of Scheme
            (July 15, 2010) . . . . . . . . . . . . . 16

        (2) Continued Surveillance (August 2010) -
            Grigoryan & Harutyunyan . . . . . . . . . 18

        (3) Continued Surveillance (September 2010) -
            Artak Ovsepian & Mendez . . . . . . . . . 19

    B.  Interviews of Compromised Beneficiaries . . . . 22

        (1) Veteran Beneficiary E.P. - Identified
            Washington, A.Grigorian, Manor . . . . . . 23

        (2) Beneficiary T.D. - Identified A.Grigoryan,
            Harutyunyan, Manor, Huntington, L.Ovsepian,
            N. Grigoryan, and Washington . . . . . . . 24

        (3) Veteran Beneficiary R.R. - Identified
            A.Grigorian, Manor, and L.Ovsepian . . . . . 25

-i-

## TABLE OF CONTENTS CONT'D

PAGE(S)

(4) Beneficiary S.M. - Identified Harutyunyan and Manor . . . . . . . . . . . . . . . . 26

(5) Beneficiary J.H. - Identified Harutyunyan, Manor, and Huntington . . . . . . . . . . . 27

(6) Beneficiary R.E. - Identified Manor . . . . . 28

(7) Beneficiary Su.P . . . . . . . . . . . . . . 28

(8) Beneficiary T.L. . . . . . . . . . . . . . . 29

(9) Beneficiary H.L. . . . . . . . . . . . . . . 30

(10) Beneficiary Q.T. . . . . . . . . . . . . . . 30

(11) Beneficiary H.T. . . . . . . . . . . . . . . 31

(12) Beneficiary R.S. . . . . . . . . . . . . . . 32

(13) Beneficiary N.P. . . . . . . . . . . . . . . 33

(14) Veteran Beneficiary F.O. . . . . . . . . . . 33

(15) Beneficiary R.H. . . . . . . . . . . . . . . 34

(16) Beneficiary S.P. . . . . . . . . . . . . . . 34

(17) Beneficiary H.C. . . . . . . . . . . . . . . 34

(18) Beneficiary S.A. . . . . . . . . . . . . . . 35

(19) Beneficiaries A.V. and spouse M.V. . . . . . 35

(20) Beneficiary V.K. . . . . . . . . . . . . . . 35

(21) Beneficiary R.A. . . . . . . . . . . . . . . 36

(22) Beneficiary V.G. . . . . . . . . . . . . . . 36

(23) Beneficiary G.G. . . . . . . . . . . . . . . 36

(24) Beneficiary L.S. (billed by Pacific Grand) Identified Mendez . . . . . . . . . . . . 36

C.   Undercover Operation . . . . . . . . . . . . . . 37

(1) L. Ovsepian Solicits Sunny Bay Pharmacy (January 25, 2011) . . . . . . . . . . . 37

## TABLE OF CONTENTS CONT'D

PAGE(S)

(2) Artak Ovsepian Brings Beneficiaries to
    Sunny Bay (January 25 and 26, 2011) . . . . . . 38

(3) Undercover Operation at Sunny Bay
    (January 27, 2011) . . . . . . . . . . . . 39

(4) Undercover Operation at Manor
    (February 8, 2011) . . . . . . . . . . . . 41

(5) Undercover Call to Huntington
    (February 22, 2011) . . . . . . . . . . . . 45

D.  Administrative Audits and Interviews . . . . . . . 46

(1) Prescriptions Solutions Inc. ("PSI") Medicare
    (Part D) Audit(relates to Huntington, Lim, L.
    Ovsepian, Hovannisyan, Johnson) . . . . . . . 46

(2) CVS Caremark (Medicare Part D) Audit -
    Relates to Tri Med, Adams Square,
    Pacific Grand, and West Vern) . . . . . . . . 50

(3) California DHCS Medi-Cal Audits . . . . . . . 53

        Huntington (Lim and Khou) . . . . . . . . 53

        Pacific Grand and Tri-Med . . . . . . . . 54

        Garos . . . . . . . . . . . . . . 56

(4) Better Care Pharmacy Audit (Relating to
    Manor; L.Ovsepian) . . . . . . . . . . . . 58

E.  Continued Surveillance of Scheme . . . . . . . . . 58

(1) January 11, 2011 (West Vern and Midway Drugs) . 59

(2) May 19, 2011 (Midway Drugs) . . . . . . . . . 60

(3) May Trash Search . . . . . . . . . . . . . 63

(4) July 19, 2011 (Merced Medical) . . . . . . . 64

(5) July 20, 2011 (Merced Medical) . . . . . . . 65

(6) September 20 and 21, 2011 (Merced Medical) . . 67

## TABLE OF CONTENTS CONT'D

PAGE(S)

      (7) Additional Information from Video
         Surveillance at Manor . . . . . . . . . . . 68

F.  Citizen Complaint (Regarding Mendez and Manor) . . . 69

G.  Tamazyan and N. Ovsepyan . . . . . . . . . . . . . 71

     (1) Search of Tamazyan's Car (October 21, 2011) . . 71

     (2) Search of Tamazyan's and N. Ovsepyan's
        Residence (February 16, 2011) . . . . . . . . . 72

H.  Structuring and Money Laundering (Lim and Khou) . . 74

     (1) Money Laundering . . . . . . . . . . . 74

     (2) Structuring . . . . . . . . . . . . . 76

I.  Training and Experience . . . . . . . . . . . . 78

J.  Manor is Permeated with Fraud . . . . . . . . . 82

K.  Additional Information Regarding Residences . . . . 84

L.  Training and Experience on Digital Devices . . . . . 85

VII. Conclusion . . . . . . . . . . . . . . . . . . 90

1

## TABLE OF CONTENTS OF ALL LOCATIONS

2
**PAGE(S)**

3  Manor Medical Imaging Clinic ("Manor")  . . . . . . . . .  passim

4  PS Enterprise d/b/a Huntington Pharmacy ("Huntington")  .  passim

5  Pacific Grand Pharmacy ("Pacific Grand")  . . . . . . . .  passim

6  Adams Square Pharmacy ("Adams Square")  . .  6, 9, 35, 50, 52, 53

7  Midway Drugs Pharmacy ("Midway Drugs")  . . .  6, 9, 40, 59, 61-63

8  Merced Medical Pharmacy ("Merced Medical")  . . . . .  6, 9, 62-67

9  Tri Med Wholesale ("Tri-Med") . . . . . . . . . . . . .  passim

10  Ovsepian (Lianna, Izabella, and Archak) Residence . . .  9, 21, 84

11  Artak Ovsepian Residence  . . . . . . . . . . . . . . .  9, 59, 84

12  Grigoryan (Arman, Elizabeth, and Nuritsa) Residence . .  9, 16, 85

13  Harutyunyan Residence  . . . . . . . . . . . . . . . . .  10, 85

14  Johnson Residence . . . . . . . . . . . . . . . . . . .  10, 84

15  Lim and Khou Residence  . . . . . . . . . . . . . . . .  10, 84

16

17

18

19

20

21

22

23

24

25

26

27

28

# **A F F I D A V I T**

I, Laura Wilbur, having been duly sworn upon oath, hereby depose and state:

## I. **INTRODUCTION**

1)      I am a peace officer employed since January 2007 as a Special Agent ("SA") by the Bureau of Medi-Cal Fraud and Elder Abuse ("BMFEA") of the California Department of Justice ("Cal-DOJ"), where I currently investigate health care fraud, including Medicare and Medi-Cal fraud.  In January 2011, I was cross-designated as a federal task force officer.

2)      I was previously an investigator with the California Department of Motor Vehicles ("DMV") from 2001 to 2007, where my duties included internal affairs investigations and investigations of identity theft, vehicle theft, and consumer fraud by automobile dealerships. From 1994 to 2001, I was a fraud investigator with the California Department of Health Services, where my duties included investigations into Medi-Cal fraud, identity theft, and fraudulent documents.  From 1991 to 1994, I was a SA with the U.S. Secret Service, where my duties included investigations of treasury check fraud, credit card fraud, counterfeit currency, and fraudulent documents, and the protection of U.S. and foreign dignitaries.

3)      My formal education and training include a BA degree in international affairs from Northern Arizona University, and a specialized law enforcement advanced certificate from the Commission on Peace Officer Standards and Training (POST).  I completed a POST-certified specialized investigator basic academy in May 1995 and a seven-week special agent academy sponsored by the California Department of Justice in June 2007.  I have completed 40 hours of training specifically related to Medi-Cal fraud investigations, and I have completed various POST-approved courses for law enforcement.  I also successfully completed the criminal investigators course at the Federal Law Enforcement Training Center in 1991, and the U.S. Secret Service special agent training course in 1992.

4)     In addition to this formal training, I have received on-the-job training in health care fraud, involving both Medi-Cal and Medicare, from experienced agents, attorneys, and other experts in the field of fraud who have described schemes that are commonly used by persons who are criminally involved in attempting to obtain money from individuals, businesses, or public entities by fraudulent means.  As a result of my training and experience, I am familiar with the federal and state laws relating to health care fraud and the investigation of health care fraud.  I am familiar with the rules and regulations that govern health care providers who bill government health care for services, and the processing of claims, payment of claims, and record retention.  I am also familiar with the methods and means used by criminals in committing fraud and health care fraud.

5)     I am closely working on the case that is the subject of this affidavit with SA Paul Ramirez (also with Cal-DOJ).  SA Ramirez was appointed with BMFEA in July 2007, is also a California peace officer, and has been awarded the POST Basic and Intermediate certificates. SA Ramirez was a peace officer for the Medical Board of California from August 2004 until July 2007.  In that position, SA Ramirez investigated California's licensed medical practitioners and other licensed allied health agencies for criminal and administrative violations involving the unlicensed practice of medicine, prescription drug crimes, monetary fraud, and provider health insurance fraud.  SA Ramirez has a BA degree in Sociology/ Law and Society from the University of California, Riverside, has completed more than 640 hours of personalized training and instruction from the POST Specialized Investigator Basic Course and the 300-hour Special Agent Academy.  SA Ramirez has attended many POST certified, law enforcement training schools, including courses on money laundering, white collar crime, economic crime, organized crime, and identity theft.

6)     Cal-DOJ BMFEA has worked closely on the investigation underlying this search warrant affidavit with Health and Human Services – Office of Inspector General ("HHS/OIG");

2

the Food and Drug Administration ("FDA"); and the Internal Revenue Service ("IRS"), as well

as agents and officers from Immigration and Customs Enforcement ("ICE"); US Office of

Inspector General Veterans Affairs ("VA/OIG"); Drug Enforcement Agency ("DEA");

California Department of Health Care Services; San Marino Police Department; California

Medical Board; Los Angeles County Sheriff's Office; and Medicare Contracted Health Integrity.

      7)     The facts and circumstances set forth in this affidavit are based upon my personal

participation in this investigation; information relayed to me from SA Ramirez; information

obtained from other participating law enforcement agents and officers, and other individuals; my

review of documents and computer records related to this investigation; oral and written

communications with others who have personal knowledge of the events and circumstances

described herein; review of publicly available information, including information available on

the Internet; and records received via legal process. Because this affidavit is submitted for the

limited purpose of establishing probable cause in support of the application for search and arrest

warrants, it does not set forth each and every fact that I, or others, have learned during the course

of this investigation.

## II. <u>SUMMARY OF CRIMINAL SCHEME</u>

      8)     As described in detail in this affidavit, beginning as early as January 1, 2009,

various individuals working through Manor Medical Imaging clinic ("MANOR") and in concert

with multiple pharmacies (the "SUBJECT PHARMACIES") have participated in a criminal

prescription harvesting scheme to defraud Medicare and Medi-Cal into paying millions of dollars

to the co-schemers. In this scheme, MANOR recruits veterans and low-income and elderly

Medicare and Medi-Cal beneficiaries, as well as uses stolen beneficiary information,

(collectively referred to as "compromised beneficiaries" or "beneficiaries")[1] to bill Medicare and

---

[1] Beneficiaries are referred to in this affidavit by their initials in order to protect their privacy.

3

Medi-Cal for millions of dollars worth of illegitimate medical services and the issuance of prescriptions, through the SUBJECT PHARMACIES, for dangerous and expensive anti-psychotic drugs.  The dispensed drugs are not then provided to the beneficiaries but, rather, diverted to black market wholesalers and back to the SUBJECT PHARMACIES, where the scheme participants re-label, re-package, and re-dispense the medications to compromised beneficiaries --- and re-bill Medicare and/or Medi-Cal as though they are billing for new (never been dispensed) bottles of drugs.  By doing so, the co-schemers use one expensive bottle of anti-psychotic medications to fraudulently bill Medicare or Medi-Cal many times over through compromised beneficiaries.  As a result of this scheme, more than approximately $18 million in fraudulent claims have been submitted to Medicare and Medi-Cal, of which approximately $7.3 million has been paid, for claims that should not have been submitted.  This prescription harvesting scheme is ongoing.

A.      SCHEME PARTICIPANTS AND EXECUTION

9)      The scheme summarized above, which is described in greater detail later in this affidavit, is perpetrated by numerous individuals playing different roles, who generally operate in the scheme as follows:

a.      MANOR, which, according to its Medicare provider application, identifies itself as an Independent Diagnostic Testing Facility ("IDTF"), operates in Glendale and is run by the following individuals:  Arman GRIGORYAN ("**A.GRIGORYAN**"), who is listed as MANOR's president on both MANOR's Medicare certification and Secretary of State records; Lianna 'Lili' OVSEPIAN ("**L.OVSEPIAN**"), who investigation shows to be MANOR's office manager and promoter; Kenneth Wayne JOHNSNON, M.D. ("**JOHNSON**"), who lists MANOR as his employer on his Medicare provider application and who issues, and allows to be issued, prescriptions in his name for the fraudulently billed prescriptions; Nurista 'Nora' GRIGORYAN ("**N.GRIGORYAN**"), who investigation shows to be acting as a unlicensed medical

1    professional issuing prescriptions in JOHNSON's name; Izabella A. Ovsepian ("I. Ovsepian"),

2    who investigation shows to be MANOR's point of contact for the SUBJECT PHARMAICES;

3    and Seda Zakaryan ("Zakaryan") and Artur Arakelyan ("Arakelyan"), who investigation shows

4    to be MANOR office staff who assist with the processing of compromised beneficiaries.

5            b.       MANOR utilizes individuals commonly referred to as "cappers," to

6    recruit, organize, transport (to and from the MANOR clinic), and pay compromised

7    beneficiaries.  The following individuals have been identified in this investigation as "cappers"

8    for MANOR:  Lisa D. 'Danielle' MENDEZ ("**MENDEZ**"); Anthony Glen JONES ("**JONES**");

9    David 'Green Eyes' SMITH ("**SMITH**"); Richard Bond WASHINGTON ("**WASHINGTON**");

10   and Vincent 'Minh' VO ("Minh").

11           c.       When beneficiaries arrive at MANOR, the MANOR employees listed

12   above collect beneficiary identifying information (which may then be used in the scheme without

13   the individual beneficiaries' knowledge) and issue prescriptions, written or approved by

14   JOHNSON (referred to herein as "JOHNSON prescriptions") without any medical examination

15   or legitimate medical purpose, to those compromised beneficiaries.

16           d.       Thereafter, "drivers" or "runners" employed by MANOR transport

17   compromised beneficiaries between MANOR and SUBJECT PHARMACIES, where the

18   fraudulent prescriptions are filled and billed to Medicare and Medi-Cal.  MANOR is shown to

19   utilize a SUBJECT PHARMACY until the pharmacy is detected by insurance auditors for

20   suspicious billing patterns, and then MANOR moves on to another SUBEJCT PHARMACY.

21   The SUBJECT PHARMACIES identified during the course of the investigation are PS

22   Enterprises d/b/a HUNTINGTION Pharmacy ("HUNTINGTON"), which is owned by co-

23   schemers Phic "PK" LIM ("**LIM**"), who is also the pharmacist, and Theana KHOU ("**KHOU**");[2]

24   _____

25        [2] HUNTINGTION's Medi-Cal Provider Application indicates that LIM is the President
     with 30% ownership, LIM's wife KHOU is 30% owner, and KHOU's mother Eng S. An is 40%
     owner.

                                                          5

1  PACIFIC GRAND Pharmacy ("PACIFIC GRAND"); ADAMS SQUARE Pharmacy ("ADAMS

2  SQUARE"); WEST VERN Pharmacy ("WEST VERN"); GAROS Pharmacy ("GAROS");

3  MIDWAY DRUGS Pharmacy ("MIDWAY DRUGS"); and MERCED MEDICAL Pharmacy

4  ("MERCED MEDICAL").

5          e.      The "runners" ensure that the beneficiaries' prescriptions are filled, serve

6  as lookouts, and ultimately deliver the medications, now diverted, to MANOR and co-schemers.

7  The following individuals have been identified in this investigation as such "drivers" or

8  "runners": Artur HARUTYUNYAN ("**HARUTYUNYAN**"); Edgar HOVINNISYAN

9  ("**HOVANNISYAN**"); Mikayel GHUKASYAN ("**GHUKASYAN**"); Artak OVSEPIAN

10 ("**Artak OVSEPIAN**"); Archak 'Ray' Ovsepian ("Archak Ovsepian"); Artyom

11 YEGHIAZARYAN ("**YEGHIAZARYAN**") and Samvel TAMAZYAN ("**TAMAZYAN**"),

12 assisted by his wife Nune OVSEPYAN ("**N.OVSEPYAN**").  After the prescription medications

13 are turned over to MANOR, the compromised beneficiaries are paid a small sum of cash and the

14 runners or cappers return them to the pick-up location (often in low-income and veteran areas).

15         f.      The co-schemers thereafter engage in black market dealing of the diverted

16 drugs, often selling them at a discounted rate to SUBJECT PHARMACIES (for the pharmacies

17 to re-fill for future beneficiaries and re-bill to Medicare and Medi-Cal) and black market drug

18 runners.  The SUBJECT PHARMACIES are believed to utilize fraudulent invoices from drug

19 wholesalers, including from a secondary drug wholesaler, "Tri Med Wholesale" ("TRI-MED"),

20 to conceal during audits and/or investigations the drug diversion scheme by making it appear as

21 though the SUBJECT PHARMACIES are buying new medications from legitimate wholesalers

22 rather than medications that have already been dispensed to beneficiaries and billed to the

23 government programs.  The "new" medications purchased from TRI-MED by the SUBJECT

24 PHARMACIES (as reported on false invoices) are the same anti-psychotic medications

25 identified as being illegally diverted during the course of the investigation.

**B.      SCOPE OF THE SCHEME**

10)      As stated above, according to Medicare and Medi-Cal payment records of the SUBJECT PHARMACIES, from September 1, 2009 to July 27, 2011, JOHNSON prescriptions have generated more than $7,291,419 worth of paid prescription claims, and an additional $10,753,979 of attempted and denied prescription claims, totaling more than approximately $18,000,000 in intended and actual loss to the government-funded programs.

11)      Although JOHNSON prescriptions have generated millions of dollars, according to Medicare Part B (discussed below) billing claims submitted by MANOR (under National Practitioner Identifier ("NPI") Number 1578653325), a self-identified IDTF, MANOR has been paid only approximately $20,766 for IDTF-related services for the three-year span from September 1, 2007 to November 8, 2010 (the last date that MANOR received a payment). MANOR has not submitted Medi-Cal claims for any IDTF-related practices.

12)      Medicare Part B records show that from November 19, 2007 through June 21, 2011 (the most recent records), JOHNSON (under NPI number 1972560449 and Medicare Upin # BT1482) submitted 3,096 claims for a total of $644,445.  Of those, 2,805 claims totaling $90,098 were paid to JOHNSON (meaning that $554,346 in claims were denied).  JOHNSON is the referring physician for $83,528 of those paid claims, the majority of which are related to IDTF services.  According to Medi-Cal billing records for JOHNSON, JOHNSON has submitted over 2,100 IDTF-related Medi-Cal claims (around $40K), all of which were denied.  As of the writing of this affidavit, JOHNSON has not been paid or reimbursed for any Medi-Cal claims since 2006.  These claims did not reflect regular office visits or show regular patient care visits.

13)      Medi-Cal billing records for HUNTINGTON, the main SUBJECT PHARMACY used in 2010, further illustrate the scope of the scheme.  HUNTINGTON records show a significant spike in Med-Cal claims in the year 2010, correlating with an increase in JOHNSON prescriptions:

a.      Specifically, records show that HUNTINGTON was paid the following amounts for prescription claims:

2006: $58,683.70

2007: $40,407.60

2008:$27,181.74

2009: $44,498.94

2010: **$1,486,713.67**

2011 (through August 24): $14,558.98

b.      Medi-Cal records indicate that from September 1, 2009 to May 1, 2011, HUNTINGTON submitted a total of 5,105 claims, billing Medi-Cal $7,768,238.47 (much of which, as indicated by the numbers above, were denied).  Of those claims, 3,929, worth $7,440,929.29, were from JOHNSON prescriptions.  Therefore, JOHNSON prescriptions accounted for 96% of HUNTINGTON's Medi-Cal billings for this time period.  For the year 2010, 85% of HUNTINGTON's submitted claims to Medi-Cal were generated by JOHNSON prescriptions; in that same year 98% of HUNTINGION's paid Medi-Cal claims were to reimburse JOHNSON prescriptions and HUNTINGTON was paid $1,463,194.  Before September 2009, HUNTINGTION was not billing for JOHNSON prescriptions.  Further, DHCS records show that, from February to July 2010, 74% of the beneficiaries filling JOHNSON prescriptions at HUNTINGTION received either Zyprexa or Abilify, both expensive anti-psychotic medications.

c.      Based on bank records, during the time that HUNTINGTON was filling JOHNSON prescriptions, hundreds of thousands of dollars were being structured into and laundered through HUNTINGTON accounts controlled by LIM and KHOU.

### III.  <u>PURPOSE OF AFFIDAVIT (SEARCH AND ARREST WARRANTS)</u>

14)     This affidavit is submitted in support of applications to search the following locations (collectively referred to as the "SUBJECT PREMISES") , which are described further in Attachments A-1 through A-14, incorporated as though fully set forth herein by reference:

a.     MANOR: 520 W. Colorado St. Glendale, California.

b.     TRI-MED Wholesalers: 52 East Santa Anita Ave. Burbank, California and 1905 Victory Blvd. #15, Glendale, California.

c.     SUBJECT PHARMACIES: [3]

    i.     HUNTINGTON: 2300 Huntington Dr., San Marino, CA;

    ii.     PACIFIC GRAND: 501 W. Glenoaks Dr. #12, Glendale, CA;

    iii.     ADAMS SQUARE: 1122 E. Chevy Chase Dr. #A, Glendale, CA;

    iv.     MIDWAY DRUGS: 10410 Lower Azusa Rd., #102 El Monte, CA;

    v.     MERCED MEDICAL: 1515 Merced Ave. West Covina, CA.

d.     Residences of Co-Schemers:

    i.     OVSEPIAN (Lianna, Izabella, and Archak) RESIDENCE: 9430 Tujunga Canyon Blvd. Tujunga, CA.

    ii.     Artak OVSEPIAN RESIDENCE: 9444 Tujunga Canyon Blvd. Tujunga, CA.

    iii.     GRIGORYAN (Arman, Elizabet, and Nuritsa) RESIDENCE: 1344 5th St. Apartment #3, Glendale, CA.

---

[3] Although WEST VERN Pharmacy, previously located at 2490 Honolulu Ave. Suite 140 B, Montrose, California, and GAROS Pharmacy, previously located at 1646 E. Washington Blvd. Pasadena, California, are also referred to herein as SUBJECT PHARAMCIES, investigating agents learned that in September and October 2011, these pharmacies ceased operating and their previous business locations are now vacant.  Accordingly, the government is not seeking to search these locations.

iv.     HARUTYUNYAN RESIDENCE: 600 N. Kenwood St. Glendale, CA.

v.     JOHNSON RESIDENCE: 7033 La Tijera I 202, Los Angeles, CA.

vi.     LIM and KHOU RESIDENCE: 1298 South El Molino Avenue, Pasadena, CA.

15)     This affidavit is also submitted in support of arrest warrants for and a criminal complaint charging the following individuals for violations of 18 U.S.C. § 1349 (Conspiracy to commit health care fraud:

a.     A.GRIGORYAN; L.OVSEPIAN; JOHNSON; N.GRIGORYAN; HARUTYUNYAN; Artak OVSEPIAN; LIM; KHOU; HOVANNISYAN; GHUKASYAN; MENDEZ; JONES; SMITH; YEGHIAZARYAN; WASHINGTON; TAMAZYAN; and N.OVSEPIAN (collectively, "the TARGET SUBJECTS").

## IV.  ITEMS TO BE SEIZED

16)     Based upon my training and experience and the probable cause set forth below, I respectfully submit that there is probable cause to believe that the Items to be Seized set forth in Attachments B-1 through B-14, which are hereby incorporated by reference, constitute evidence of 18 U.S.C. §§ 1349 (conspiracy to commit health care fraud); 1029 (access device fraud); 1028 (identity theft); 1957(h) (conspiracy to launder monetary instruments and engage financial transactions with the proceeds of unlawful activities); 21 U.S.C. §§ 331(k) & (t) (unlicensed distribution of prescription drugs and distribution of misbranded prescription drugs), as set forth in Attachments B-1 through B-14, the and that the Items to be Seized will be found at the respective SUBJECT PREMISES.

## V. <u>OVERVIEW OF HEALTHCARE PROGRAMS & RELEVANT DRUGS</u>

**A.    MEDICARE**

17)    I know from my training and experience, investigation in this case, and from information provided to me from other agents and officers in this investigation that the Medicare program is a federally funded health insurance program, as defined by 18 U.S.C. § 24(b), that operates as described below:

a.    Medicare provides funds for free or below-cost health care services and prescription drugs to certain persons, primarily the elderly and certain disabled persons. These covered individuals are referred to herein as "beneficiaries" ("benes") or "patients." Medicare assigns each beneficiary a health insurance claim number ("HICN") to identify the beneficiary for billing purposes. As explained below, prescription medications that are covered by Medicare are billed through Medicare Part D, while the actual physician visits leading to the writing of those prescriptions are billed through Medicare Part B.

b.    The U.S. Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS") oversees and administers the Medicare program, including, through contractors, the processing and payment of Medicare claims. The benefits available under Medicare are governed by federal statutes and regulations.

**(1) <u>Medicare Part B</u>**

c.    Medicare Part B (Medical Service Insurance) provides reimbursement for certain medically necessary physician services and medically necessary outpatient tests ordered by a physician. To obtain direct reimbursement from Medicare, a provider of medical services must first apply for a provider number, which is used for the processing and payment of claims. By signing the provider application, the provider agrees to abide by Medicare rules and regulations, including the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), which prohibits the knowing and willful payment of remuneration for the referral of Medicare patients.

d.      To then obtain payment for Part B services, an enrolled physician or clinic, using its Medicare provider number, submits claims to Medicare, using the beneficiary's HICN.  Medicare claims may be submitted by the provider through the mail or electronically. Every claim submitted by or on behalf of a provider certifies that the information on the claim form is truthful and accurate and that the services provided were reasonable and necessary to the health of the Medicare beneficiary.

e.      Medicare Part B generally reimburses 80% of the Medicare "allowed amount" on covered physician services and outpatient tests.  The remaining 20%, known as the co-payment, may be covered by a secondary insurance plan, by Medi-Cal, or paid by the patient.

**(2) Medicare Part D**

f.      Medicare Part D (Prescription Drug Coverage Insurance) provides coverage for outpatient prescription drugs.  Medicare beneficiaries can obtain Part D coverage in two ways: they can enroll in one of many prescription drug plans ("PDP"), which cover only prescription drugs and are offered by qualified private insurance plans, such as United Healthcare Insurance Company, Health Net Life Insurance Company, Anthem Insurance Companies, and Unicare Life and Health Insurance Company, which receive reimbursement from Medicare; or they can join a Medicare Advantage plan that covers both prescription drugs and medical services.

g.      Medicare PDPs commonly provide beneficiaries with identification cards to present at pharmacies to obtain prescription drugs.  Beneficiaries will then fill their prescriptions at pharmacies by utilizing their Medicare coverage to cover the prescription cost. A beneficiary is responsible for any deductible or co-payment required under his PDP.

h.      To obtain reimbursement for prescription drugs provided to such Medicare beneficiaries, pharmacies submit their prescription claims (also known as a Prescription Drug Event ("PDE")) for payment to the beneficiary's plan using the beneficiary's HICN and/or

Medicare plan identification number.  Typically, a pharmacy submits a group of PDEs at a time to a Part D plan, and then the Part D plan sends a reimbursement check to the pharmacy by either warrant (similar to a bank check) or electronic transfer; the plan then bills Medicare through CMS and Medicare pays the plan sponsor.

18)     During the relevant time period, MANOR, JOHNSON and the SUBJECT PHARMACIES were all Medicare providers.

**B.     MEDI-CAL**

19)     I know from my training and experience, investigation in this case, and from information provided to me from other agents and officers in this investigation that the Medi-Cal program is a state-administered program, funded by both the state and federal governments, so is it also federally funded health insurance program,[4] as defined by 18 U.S.C. § 24(b), that operates as described below:

a.     Medi-Cal provides coverage for essential medical care and services for California's qualifying indigent, elderly, disabled, and refugees.  These covered individuals are also referred to herein as "beneficiaries" ("benes") or "patients."  Medi-Cal reimburses health care providers providing medically necessary treatment and services to Medi-Cal beneficiaries.

b.     Medi-Cal is regulated by the California Department of Health Care Services ("DHCS"), which promulgates rules for the administration of the program.  DHCS authorizes provider participation, determines beneficiary qualification, and issues Medi-Cal eligibility cards to beneficiaries for their use to obtain goods and services from Medi-Cal providers.

c.     Medi-Cal providers (such as physicians, pharmacies, durable medical equipment suppliers, etc.) participate in Medi-Cal on a voluntary basis and are not government employees. Beneficiaries present their Medi-Cal eligibility cards to the providers for goods and services. Providers typically photocopy these cards, which contain information such as the beneficiary

---

[4]  Medi-Cal also receives matching funds from United States Medicaid.

1    identification number, name, and date of birth.  This information enables providers to bill Medi-

2    Cal for services and goods, including prescriptions, rendered by the provider to the beneficiaries.

3         d.      Health care providers receive direct reimbursement from Medi-Cal by applying to

4    Medi-Cal and receiving a Medi-Cal provider number.  To obtain payment for services, an

5    enrolled provider, using its unique provider number, submits claims to Medi-Cal certifying that

6    the information on the claim form is truthful and accurate and that the services or goods provided

7    were reasonable and necessary to the health of the Medi-Cal beneficiary.  Claims are mailed or

8    transmitted electronically by providers to DHCS's contracted fiscal intermediary, currently

9    Electronic Data Systems, which processes claims on behalf of Medi-Cal.  Once claims have been

10   through an edits and audits review, then EDS informs DHCS and the State Controller's Office.

11   The Controller's Office then sends payment to the provider in the form of a California State

12   Warrant (similar to a bank check).

13        20)     During the relevant time period, JOHNSON and the SUBJECT PHARAMCIES

14   were all Medi-Cal providers.

15   **C.    PHARMACEUTICAL DRUGS AT ISSUE IN THIS INVESTIGATION**

16        21)     Based on my training and experience, the investigation in this case, and my

17   conversations with SA Ramirez, I know that a recent trend identified by health care fraud law

18   enforcement agencies is the increase in the fraudulent prescribing and dispensing of expensive

19   atypical anti-psychotic medications ("PSYCH MEDS") with no legitimate medical purpose.

20   PSYCH MEDS are dangerous and expensive drugs, yet they are not tracked by the California

21   Department of Justice like other commonly diverted drugs because PSYCH MEDS are not

22   federally scheduled controlled substances.  Accordingly, I believe that those who commit health

23   care fraud using PSYCH MEDS do so because they believe that they will receive a substantial

24   reimbursement from the heath care programs and yet will go undetected because it is more

25

difficult for law enforcement to detect and track the fraud.[5]   The PSYCH MEDS most mentioned in this affidavit are:

       a.     Abilify (generic name Aripiprazole): Abilify is an anti-psychotic agent, FDA approved to treat bipolar disorder, major depressive disorder, and schizophrenia.  Abilify is also known on the street as "Abili," "A," or "Abo."   Based on my training and experience, I know that a 90-count prescription bottle of 20 mg pills sells on the black market for $540 to $550.  The average Medi-Cal reimbursement rate for such bottle is $1,820, and the Medicare average rate is $1,500.

       b.     Seroquel (generic name Quetiapine Fumarate): Seroquel is an anti-psychotic agent, FDA approved to treat bipolar disorder, major depressive disorder, and schizophrenia.  Seroquel is also known on the street as "S," "Quell," or "Serajos."  Based on my training and experience, I know that a 90-count prescription bottle of 300 mg pills sells on the black market for $690 to $700.  The average Medi-Cal reimbursement rate for such bottle is $2,089, and the Medicare average rate is $2,800.

       c.     Zyprexa (generic name Olanzapine): Zyprexa is an anti-psychotic agent, FDA approved to treat bipolar disorder, major depressive disorder, and schizophrenia.  Zyprexa is also known on the street as "Z."  Based on my training and experience, I know that a 90-count prescription bottle of 20 mg pills sells on the black market for $900 to $1,000.  The average Medi-Cal reimbursement rate for a 20mg 90 count is $2,524.34, and the Medicare average rate is $2,160.

---

[5]   Indeed, loss prevention fraud investigators from major retail pharmacies have reported that these types of non-scheduled controlled substances are targeted in organized retail burglaries.  During the past year in the Southern California metropolitan area alone, more than forty major chain pharmacies have been burglarized, reporting that only PSYCH MEDS were stolen (and not other controlled substances).  Because PSYCH MEDS are now being used in the commission of health care fraud, these drugs have also developed a "street value," that is, the price these drugs carry on the black market.

22)     Based on my training and experience, the investigation in this case, and my conversations with SA Ramirez, I know that another trend identified by health care fraud law enforcement agencies is that those who commit health care fraud by fraudulently prescribing PSYCH MEDS will also include other drugs in those prescriptions, which I identify herein as FILLER DRUGS.  FILLER DRUGS are prescribed to evade detection by including drugs other than PSYCH MEDS and thus making it appear that the prescriptions address multiple ailments or medical conditions.  Because FILLER DRUGS assist in the criminal scheme, these drugs also carry a street value.  Commonly identified FILLER DRUGS prescribed to beneficiaries in this investigation include: Actonel, Actos, Advair Diskus, Aricept, Detrol LA, Lipitor, Nexium, Plavix, Tricor, Vytorin, Micardis, Crestor, Lexapro, Singulair, Boniva, Meloxicam, Enablex, Zetia, Celebrex, Visacare, Aggrenox and Caduet.

## VI. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.      INITIATION OF INVESTIGATION

#### (1)      <u>Detection and Initial Surveillance of Scheme (July 15, 2010)</u>

23)     On July 15, 2010, I was contacted by San Marino Police Department ("SMPD") Lieutenant Steve Johnson, who reported the following:  Earlier that day, SMPD officers noticed several persons who appeared to be transient leave HUNTINGTON and enter a white Toyota Sienna van (license plate number ("LPN") 5YAU752, vehicle identification number ("VIN") 5TDZA23C26S584025; R/O: Vahan Davidyan) (hereinafter, "BENE VAN#1").  BENE VAN#1 was followed to a nearby residential street where it met with a white Mercedes Benz (LPN 6CDR457; R/O: A.GRIGORYAN at the GRIGORYAN RESIDENCE) (hereinafter "A.GRIGORYAN Benz"), with a female driver and a male passenger.  The male passenger of the A.GRIGORYAN Benz walked up to the passenger side of BENE VAN#1, spoke with the occupants for a minute, and then returned to the A.GRIGORYAN Benz carrying a bag.  Officers, reviewed A.GRIGORYAN's California Drivers License ("CDL") information, and stated that

the male who received the bag from BENE VAN#1 appeared to be A.GRIGORYAN.  The

A.GRIGORYAN Benz was followed, but surveillance lost sight of it around the 500 block of W.

Colorado St. in Glendale, which I now know is close in proximity to MANOR.

24)     Given this report of suspicious activity, SA Ramirez thereafter reviewed the

Medi-Cal billing history for HUNTINGTION and learned of a significant spike in its billing:

from January to July 2010, HUNTINGTION received more than $1.3 million from Medi-Cal for

prescription reimbursements and had been denied more than $3.6 million for submitted

prescription claims.  Of the more than $1.3 million paid by Medi-Cal (for 2,169 submitted

claims), more than $700,000 reimbursed HUNTINGTON for filled JOHNSON prescriptions for

PSYCH MEDS.  In contrast, from February to December 2009, the previous year,

HUNTINGTION received from Medi-Cal less than $41,000 for 489 prescription claims .  Also,

during the same time period that HUNTINGTION was paid more than $700,000 for JOHNSON

prescriptions for PSYCH MEDS (January to July 2010), JOHNSON billed Medi-Cal for 1,340

claims for medical services; 100% of these service claims were denied by Medi-Cal.  I know

from my training and experience that a 100% denial rate for services, coupled with millions of

dollars in prescription claims, is a strong indication of health care fraud.

25)     SA Ramirez also learned that Medi-Cal billing records show that on July 15, 2010

(the date of the surveillance above), HUNTINGTON billed for 29 JOHNSON prescriptions,

issued to five beneficiaries; the medications billed for include PSYCH MEDS and FILLER

DRUGS.  Medicare billing records show that on this same day, HUNTINGTON billed for 15

JOHNSON prescriptions, issued to four beneficiaries; and WEST VERN billed for 29

JOHNSON prescriptions, issued to four beneficiaries; the medications billed for include PSYCH

MEDS and FILLER DRUGS.

**(2)** **Continued Surveillance (August 2010)** – **GRIGORYAN & HARUTYUNYAN**

26) On August 5, 2010, I was again contacted by SMPD Lt. Johnson, who reported that SMPD Captain Harrigan observed the same BENE VAN#1 parked adjacent to HUNTINGTON.   Lt. Johnson said that when BENE VAN#1 left the area, it was followed by a grey Mercedes Benz SUV (R/O: Saak Avakyants, who I know was incarcerated at that time for a fraud scheme) (hereinafter, "Benz SUV").   The two cars went to a residential street where the driver of the BENE VAN#1 got out and approached the driver of the Benz SUV; Capt. Harrigan was unable to determine if a hand-to-hand transaction took place.

27) SA Ramirez reviewed heath care billing records for August 5, 2010, and learned the following:  HUNTINGTON billed Medi-Cal for 18 JOHNSON prescription claims for three beneficiaries; HUNTINGTION billed Medicare for six JOHNSON prescription claims for two beneficiaries; and WEST VERN billed Medicare for four JOHNSON prescription claims for one beneficiary.  The medications billed for include both PYSCH MEDS and FILLER DRUGS.

28) On August 12, 2010, SA Ramirez and I met with SMPD to review the previous suspicious activity.  During the meeting, an SMPD officer reported that the same BENE VAN#1 had just arrived at HUNTINGTION.  SA Ramirez and I then assisted SMPD in surveillance and observed and learned of the following:

a. BENE VAN#1 driven by HARUTYUNYAN (who was identified in a subsequent traffic stop, set forth below) was at HUNTINGTON.  Several individuals who appeared to be transient left HUNTINGTON and entered BENE VAN#1.  BENE VAN#1 then drove to the same residential area observed on July 15, 2010, and parked where the Benz SUV was waiting.  The Benz SUV was driven by A.GRIGORYAN, who SA Ramirez identified once A.GRIGORYAN drove away, having previously seen his CDL photo.  A.GRIGORYAN exited the Benz SUV, walked to BENE VAN#1's passenger side, and then returned to BENE VAN#1's driver side carrying a colorful gift bag.  HARUTYUNYAN gave A.GRIGORYAN a brown

paper bag, which A.GRIGORYAN placed into the gift bag.  A.GRIGORYAN then returned to the Benz SUV and departed heading in the direction of MANOR.

       b.     Thereafter, SMPD conducted a traffic stop of BENE VAN#1.  The driver of the van was identified as HARUTYUNYAN.  HARUTYUNYAN stated that he was a driver for JOHNSON and provided the telephone number 818-xxx-1132 (which I later researched on the internet and found to be the phone number for MANOR and subsequently received subscriber information indicating the subscriber as: Manor Inc. 520 W. Colorado St. Glendale) (hereinafter, "MANOR Telephone").  The passengers were all identified, including the beneficiaries T.D. and J.H., who, as set forth below, were later interviewed

    29)    SA Ramirez then reviewed heath care billing records for August 12, 2010, and learned the following:  HUNTINGTON billed Medi-Cal for 20 JOHNSON prescription claims for three beneficiaries; HUNTINGTON billed Medicare for 10 JOHNSON prescription claims for three beneficiaries; and WEST VERN billed Medicare for 17 JOHNSON prescriptions for three beneficiaries.  The medications billed for include both PSYCH MEDS and FILLER DRUGS.

### (3) Continued Surveillance (September 2010) – Artak OVSEPIAN & MENDEZ

    30)    On September 20 and 21, 2010, BMFEA Special Agents, including myself, conducted surveillance on MANOR.  From my own observations and the observations of the other agents, I learned the following:

       a.     On September 20, 2010, a couple of suspected beneficiaries were seen leaving MANOR and visiting a 7/11 store close by before returning to MANOR.  Shortly thereafter, I saw a gray minivan (LPN 6MQM520, VIN 5TDKK3DC0BS016398; R/O Archak Ovsepian) (hereinafter "BENE VAN#2") leave MANOR's parking lot; surveillance followed it to PACIFIC GRAND.  There, agents observed a male (who had been seen at 7/11 and MANOR that day) escort, one at a time, three females from BENE VAN#2 into PACIFIC GRAND before

returning to the van minutes later.  Once the last female returned, SA Rojas observed an Armenian male, later identified, based on his CDL photo, to be Artak OVSEPIAN, walk from PACIFIC GRAND and enter the driver's side of BENE VAN#2.

       b.     SA Ramirez reviewed heath care billing records for September 20, 2010, and learned the following:  PACIFIC GRAND billed (1) Medi-Cal for seven JOHNSON prescription claims for two female beneficiaries and (2) Medicare for four JOHNSON prescription claims for one female beneficiary.  Each beneficiary filled prescriptions for one PSYCH MED and FILLER DRUGS.

       c.     On September 21, 2010, agents again observed several suspected beneficiaries, at various times, leave MANOR and visit the 7/11 store before returning to MANOR; two eventually left and boarded the "603 Grand Street" bus, which I know goes to the downtown area of Los Angeles.  Thereafter, I saw BENE VAN#2 leave MANOR's parking lot with multiple people inside.  The driver was identified as Artak OVSEPIAN, and surveillance followed BENE VAN#2 to PACIFIC GRAND.   There, Artak OVSEPIAN entered the pharmacy alone while a female, later identified based on a comparison with her CDL photo, as MENDEZ, got out of the passenger seat and into the driver seat.

       d.     SA Ramirez entered PACIFIC GRAND and observed Artak OVSEPIAN speaking to two female pharmacy employees, who he appeared to know.  SA Ramirez approached the counter and saw a stack of papers in Artak OVSEPIAN's left hand, and, in his right hand, a roll of $100 bills.  Artak OVSEPIAN pulled off one of the $100 bills and gave it to one of the female employees.  He then put the papers on the counter, and SA Ramirez could see six or seven photocopies of prescriptions; on one of them, SA Ramirez saw the words "229 N. Central Ave. Glendale, Dr. Kenneth Johnson" at the top, dated "9/21/10," for "Seroquel" with the "90" count circled.  SA Ramirez made a purchase, received a small blue bag, and left.

e.      Soon thereafter, multiple beneficiaries entered the pharmacy, one at a time or in small groups, escorted by MENDEZ.  SA Rojas went in the pharmacy and overheard Artak OVSEPIAN telling one of the female beneficiaries that the doctor had prescribed her medication, that she needed to fill out her address on a form, and that when they were done, they would be taken back downtown.  SA Rojas reported that the beneficiaries did not appear to know they were going to get medications.  At one point, Artak OVSEPIAN told two beneficiaries to call beneficiary L.S. into the pharmacy, at which time the beneficiaries, one holding a small blue bag, left.  Artak OVSEPIAN then used his cell phone and told the person on the other line to bring in L.S.  SA Ramirez, now parked across the street, saw MENDEZ escort a female beneficiary L.S.[6] to the pharmacy and several minutes later, back to BENE VAN#2.  SA Black entered the pharmacy and saw a stack of photocopied prescriptions on the counter.  SA Black observed that one prescription was from "Dr. Kenneth Johnson;" the prescription was for several different medications, including, at the top, Abilify.

f.      SA Ramirez observed Artak OVSEPIAN leave PACIFIC GRAND with several small blue bags (similar to the one SA Ramirez received with his purchase), in addition to several rolled-up white forms.  SA Black observed Artak OVSEPIAN take bottles from two of the bags, examine them, return them to the bags, and hand them to individuals inside BENE VAN#2.

g.      BENE VAN#2 then left PACIFIC GRAND and surveillance followed it to downtown Los Angeles.  There, agents observed the beneficiaries leave BENE VAN#2; the beneficiaries were not seen in possession of any of the blue pharmacy bags.  The van then left downtown and traveled to the OVSEPIAN RESIDENCE.

---

[6] L.S. was later interviewed in this investigation, as set forth below.

h.      SA Ramirez reviewed heath care billing records for September 21, 2010, and learned the following:  PACIFIC GRAND billed Medi-Cal for seventeen JOHNSON prescription claims for three beneficiaries (including L.S.)  Each beneficiary filled prescriptions for one PSYCH MED and FILLER DRUGS.  Medi-Cal billing records showed that PACIFIC GRAND also billed Medi-Cal for the same prescriptions for R.M. and L.S. on August 23, 2010.

**B.      INTERVIEWS OF COMPROMISED BENEFICIARIES**

31)      Over the course of the investigation, I have participated in, or reviewed the reports of, approximately 25 interviews of beneficiaries (including veterans and Medicare/Medi-Cal beneficiaries) whose health care records report that HUNTINGTON billed for JOHNSON prescriptions for PSYCH MEDS, and in several cases, that JOHNSON billed for services provided at MANOR.  All of the interviewed beneficiaries either (a) stated that they had no knowledge of MANOR or HUNTINGTION and did not consent to filling prescriptions using their government health care or (b) disclosed that they were recruited by others to provide their health care identities for services and prescriptions, in exchange for monetary compensation.  None of the interviewed beneficiaries knew or recognized JOHNSON or received for themselves the JOHNSON prescriptions for PSYCH MEDS billed to their health care by HUNTINGTON.

The following is information related to a sampling of specific interviews:[7]

---

[7] Some of the interviewed beneficiaries have criminal backgrounds.  Most common prior arrests and/or convictions include, but are not limited to, narcotics offenses, burglary, robbery, assault and battery.  Based on my training and experience in health care fraud investigations, and the training and experience of other agents, I know that it is not unusual for beneficiaries used in a health care fraud scheme to have such criminal records.  Moreover, even though some of the interviewed beneficiaries may have criminal backgrounds, I have found their information to be reliable because much of it has been corroborated, including through surveillance, identification by photograph and/or name, and Medicare and/or Medi-Cal records.

**(1) <u>Veteran Beneficiary E.P.</u> – Identified WASHINGTON, A.GRIGORIAN, MANOR**

32)     E.P. is a veteran who goes to a United States Department of Veterans Affairs facility in Los Angeles ("the VA") for his medical needs and prescriptions. EP's residence is 18 miles from MANOR and 21 miles from HUNTINGTON. In July 2010, E.P. reported to a VA/OIG special agent that, while at the VA in June 2010, he was recruited by WASHINGTON (a veteran who E.P had known for a year and identified in a photo) to make $100 by letting doctors copy his insurance card. E.P. explained that WASHINGTON organized and escorted a group on a city bus from the VA to a MacArthur park area bus stop, which is used as a pickup location for runners. There, a male, who E.P. identified through a photo display as A.GRIGORYAN, picked up WASHINGTON's group of veterans (including E.P.) and took them to a clinic. (Agents later drove E.P. to MANOR, which E.P. immediately recognized as the clinic to which he was taken.) At MANOR, E.P. never received a medical exam of any sort; he was only asked for his Medi-Cal card, which was taken for copying. While he and the others were sitting in the waiting room, an Armenian male dressed like a doctor told them, "If anyone asks, you have chronic back pain." E.P. also overheard WASHINGTION talking to one of the "doctors" who pointed to each of the veterans and said something about making "$1,800 off that guy, $1,800 off that guy." After the visit at MANOR, A.GRIGORYAN took the group of veterans back to the bus stop at MacArthur park and paid each of them $100; WASHINGTON told each of them to pay him $25 for his fee.

33)     Medi-Cal records show that HUNTINGTON billed two JOHNSON prescriptions (a PSYCH MED, billed for more than $6,000 and a FILLER DRUG, billed for more than $1,000) for E.P. in May 2010. Both claims were denied based on E.P.'s eligibility for service that month. Medi-Cal records show that, on that same day, HUNTINGTON billed for another 33

23

1  JOHNSON prescriptions (totaling over $80,000) for six other beneficiaries, including

2  WASHINGTON.

3      **(2) <u>Beneficiary T.D.</u> – Identified A.GRIGORYAN, HARUTYUNYAN, MANOR,**

4          **HUNTINGTON, L.OVSEPIAN, N.GRIGORYAN, and**

5          **WASHINGTION**

6      34)    T.D.'s residence, a skilled nursing facility, is 15 miles from MANOR and 18

7  miles from HUNTINGTON.  T.D. reviewed photos of MANOR and HUNTINGTION and

8  disclosed that s/he had been to both, three or four times, and was paid $100 for each visit.  T.D.

9  explained that there is a location near a mission in downtown Los Angeles where people can get

10  recruited if they have the "red, white, and blue card" (i.e., Medicare) or the "blue and white card"

11  (i.e., Medi-Cal).  T.D. stated that s/he was recruited from this location and was told to meet at a

12  McDonald's near 8th Street and Alvarado Street.  There, an individual known as "Green Eyes"

13  would direct the beneficiaries as to which van to board.  Typically, T.D. explained, two vans

14  transport beneficiaries each day.  T.D. stated that for a period of time, "Green Eyes" was "out of

15  commission" and a black male by the name of "Richard" was "running the show."  T.D. stated

16  that a photo of WASHINGTON "resembled" the person who he knew as "Richard."  T.D. stated,

17  "We all know we're being pimped by the Armenians, but we need the money."

18      35)    T.D. said each time, he and the others (beneficiaries) would be picked up in a

19  white van by one of two males (who T.D. positively identified in photos as A.GRIGORYAN and

20  HARUTYUNYAN), who would take them to MANOR.   T.D. pointed to a photo of

21  L.OVSEPIAN and stated that she works at MANOR and she takes the cards (Medicare and/or

22  Medi-Cal) from the beneficiaries.  T.D. identified a photo of N.GRIGORYAN as the "doctor"

23  who wore a white coat and stethoscope.  T.D. stated that N.GRIGORYAN would spend a couple

24  of minutes with each patient, asking them, "How are you doing today."  T.D. said s/he never saw

25  a written prescription.

36)     T.D. stated the beneficiaries would all be loaded into the van at MANOR and taken, by A.GRIGORYAN and HARUTYUNYAN, to HUNTINGTON.  There, the beneficiaries would be taken in two at a time.  They were told to write their name on a piece of paper, and an older white male would hand them each a bag.  When they returned to the van, the driver (A.GRIGORYAN and HARUTYUNYAN) took the medications from them.  The van would then drive to a side street (where the houses are "huge and beautiful") and meet another driver, to whom A.GRIGORYAN or HARUTYUNYAN would hand off a bag with the medications just filled at HUNTINGTON.  The beneficiaries would then be returned to downtown Los Angeles and paid $100.

37)     On one occasion, when A.GRIGORYAN drove seven individuals including T.D. to HUNTINGTON, the beneficiaries started looking in the pharmacy bags and the prescriptions and pointed out that "these are expensive medications."  The beneficiaries stated they would not give the medications to A.GRIGORYAN unless he paid them more; A.GRIGORYAN gave each of them $50 extra.  T.D. stated that the last time s/he went to MANOR, HARUTYUNYAN was the driver and was pulled over by the police after leaving HUNTINGTON.

38)     Medicare billing records report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH MEDS and FILLER DRUGS) for J.D. in March, April, June, and August 2010.  T.D. stated s/he never received those prescriptions, and always turned them over to the driver.  The last date billed for T.D. was on August 12, 2010, the date of surveillance set forth above, on which HARUTYUNYAN was pulled over by SMPD.

### (3) Veteran Beneficiary R.R. – Identified A.GRIGORIAN, MANOR, and
### L.OVSEPIAN

39)     R.R. is a veteran who goes to the VA for his medical needs and prescriptions.  R.R.'s residence is 16 miles from MANOR and 19 miles from HUNTINGTON.  Medicare billing records report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH MEDS

and FILLER DRUGS) for R.R. in April 2010. Medicare Part B records also report that JOHNSON billed for services provided to R.R. at MANOR in April 2010 and January 2011; those claims were denied. R.R. stated s/he has never heard of JOHNSON, has never been to HUNTINGTON, and has not received the JOHNSON prescriptions for which R.R.'s health care was billed. However, R.R. disclosed that s/he had been to multiple clinics with a man who drove six other veterans in a white van. R.R. recalled going to two clinics and a pharmacy. From a series of photos, R.R. identified MANOR as the second of the two clinics s/he was taken to and A.GRIGORYAN as the driver of the white van. R.R. stated that while at MANOR, the group was told to sit in a small waiting room and complete some paper work. R.R. stated that a woman, identified in a photo as L.OVSEPIAN, took his vital signs and R.R. was taken to a back room to meet with a male (either Caucasian or Hispanic). R.R. said this male, who R.R. believed to be a doctor, asked some questions about R.R.'s current medications and health status, but did no evaluation and never touched R.R. R.R. stated that this man then gave R.R. a prescription for multiple medications. After all the veterans were seen, they left with A.GRIGORYAN in the same white van and were taken to a pharmacy (name not recalled) somewhere off the Interstate 5 freeway. R.R. then filled approximately three prescriptions at the pharmacy and handed them over to A.GRIGORYAN in exchange for $75.

**(4) <u>Beneficiary S.M.</u> – Identified HARUTYUNYAN and MANOR**

40)    S.M.'s residence, a transitional housing unit, is ten miles from MANOR and 13 miles from HUNTINGTON. S.M. disclosed that he had been driven in a van, with others, to a medical clinic and identified a photo of HARUTYUNYAN as the driver of a van. S.M. stated that s/he met HARUTYUNYAN at 8th Street and Alvarado, and HARUTYUNYAN offered S.M. $50 to go to a medical clinic in the Glendale area. S.M. was shown a photograph of the MANOR and said, "That looks familiar. Do you have a picture of the back? We parked in the back." S.M. was not medically examined at MANOR and "just sat around." S.M. provided

his/her driver's license and Medicare and Medi-Cal cards to a female employee who later returned them. HARUTYUNYAN then gave S.M. a ride back in the van to the general area of S.M.'s residence. S.M. recalled going to a pharmacy on one occasion but could not remember if it was when S.M. met HARUTYUNYAN. S.M. stated photos of HUNTINGTON and PACIFIC GRAND "looked familiar."

41)     Medicare billing records report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH MEDS and FILLER DRUGS) for S.M. in May 2010. Medicare Part B records also report that JOHNSON billed for services provided to S.M. at MANOR in May 2010; those claims were denied. S.M. stated s/he had never met JOHNSON (and did not recognize his photo) and has not received the JOHNSON prescriptions for which S.M.'s health care was billed.

**(5) Beneficiary J.H. – Identified HARUTYUNYAN, MANOR and HUNTINGTON**

42)     J.H.'s residence, a skilled nursing facility, is 14 miles from MANOR and 13 miles from HUNTINGTON. J.H. disclosed that s/he had been taken to a clinic in a white van by a male who solicited J.H. at a 7-11 near the nursing facility, asking if J.H. wanted to go to the doctor; J.H. identified a photo of HARUTYUNYAN as that person and a photo of MANOR as the clinic. J.H. stated that at MANOR, J.H. was taken to a back room and a "doctor," described as an Armenian female, asked about J.H.'s medical history, drew blood, and examined J.H.'s heart and blood pressure. After everyone in J.H.'s group had been seen, they got into the white van with HARUTYUNYAN and went to a pharmacy, which J.H. identified through a photo as HUNTINGTON. There, each beneficiary went inside, signed their names, and were given a bag of medicines. J.H. and the others were instructed by HARUTYUNYAN to put their bags of medicine into a bag in the backset of the van. The van then drove away and followed another car to a side street where they parked. The driver of the car got out and talked to HARUTYUNYAN and HARUTYUNYAN handed him the bag with all the medications filled at HUNTINGTON.

1  This person took the bag and walked back to his car.  HARUTYUNYAN drove J.H. back to the

2  nursing facility and gave him a $100 bill.

3      43)    Medicare billing records report that HUNTINGTON filled JOHNSON

4  prescriptions (for PSYCH MEDS and FILLER DRUGS) for J.H. in March, April, June, and

5  August 2010.  Medicare Part B records also report that JOHNSON billed for services provided to

6  J.H. at MANOR in March 2010; these claims were denied.  N.P. did not recognize photos of

7  JOHNSON.

8      **(6) <u>Beneficiary R.E.</u>[8] – Identified MANOR**

9      44)    R.E.'s residence is 17 miles from MANOR and 29 miles from HUNTINGTON.

10  R.E. (who was assisted by a Spanish interpreter) suffers from Alzheimer's disease, so R.E.'s

11  spouse assisted during the interview.  R.E. only fills prescriptions at Sayre Medical Pharmacy.

12  Medicare billing records report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH

13  MEDS and FILLER DRUGS) for R.E. in April 2010; R.E. stated s/he never received those

14  prescriptions.  Medicare Part B records also report that JOHNSON billed for services provided to

15  R.E. at MANOR in April 2010; these claims were denied.  R.E. was shown a series of photos of

16  individuals and locations. R.E.'s spouse (E.E.) acknowledged having gone to MANOR with R.E.

17  E.E. identified the photo of MANOR and said s/he and R.E. were picked up from their home by

18  a Hispanic female who appeared to be a clinic employee.  They stated that they entered MANOR

19  through the rear and did not receive any exams.  Neither R.E. nor E.E. recognized photos of

20  HUNTINGTON or JOHNSON.

21      **(7) <u>Beneficiary Su.P.</u>**

22      45)    Su.P.'s residence is 43 miles from MANOR and 44 miles from HUNTINGTON.

23  Su.P. (who was assisted by a Vietnamese interpreter) was shown a photo of MANOR and Su.P.

24  stated that s/he had been there two times, once to the "old location" and once to the "new

25

---

[8] R.E. was also interviewed in relation to an audit, set forth below.

location," which Su.P. stated was the location depicted in the photo.[9]  Su.P. stated that a driver named "Minh" drove Su.P. along with seven or eight other Vietnamese people in a Honda Odyssey van.  (Su.P. later identified a photo of Minh as the driver and DMV records report Minh as the registered owner of a Honda Odyssey.)

46)     Su.P. stated that while at MANOR, s/he completed personal information forms and was weighed and given an ultrasound of the liver.  Su.P. met with a female physician, described as possibly Russian.  Su.P. stated that at the end of the visit, s/he asked for the ultrasound results but the office refused and said everything was fine.  Su.P. was not taken to a pharmacy or given any prescription or medication.  Medicare billing records report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH MEDS and FILLER DRUGS) for Su.P. in March, April, and May 2010.  Su.P. stated s/he has never been to HUNTINGTON and has never received those prescriptions.  Su.P. did not recognize photos of JOHNSON or HUNTINGTON.

**(8) Beneficiary T.L.**

47)     T.L.'s residence is 43 miles from MANOR and 40 miles from HUNTINGTON; T.L. (assisted by a Vietnamese interpreter) stated s/he fills prescriptions at Newland Pharmacy, located in Westminister, and has never received delivered medications.  Medicare billing records report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH MEDS and FILLER DRUGS) for T.L. in March, April, and May 2010.  Medicare Part B records also report that JOHNSON billed, and was paid for, services provided to T.L. at MANOR in March 2010.  T.L. stated s/he did not know JOHNSON, had never been to HUNTINGTON, and had never received the JOHNSON prescriptions for which T.L.'s heath care was billed.  T.L. disclosed, however, that T.L. had been taken to a clinic in a van by a Vietnamese man named "Minh" (who T.L. later

---

[9] Based on the investigation, I know that MANOR relocated from 229 N. Central Ave. Glendale location, to the current location, 520 W. Colorado St. Glendale in May 2010.

1  positively identified as Minh in a photo).  T.L. stated s/he met MINH at the senior center and

2  was picked up at T.L.'s house and transported, along with a group of elderly Vietnamese people,

3  to a clinic outside the area; T.L. could not remember the name or location of the clinic.  At the

4  clinic, T.L. did not meet with a doctor, but received massages and acupressure.  T.L. did not

5  receive any prescriptions at this location and was not driven to a pharmacy to pick up any

6  medications.  T.L. did not recognize photos of MANOR, HUNTINGTON, or JOHNSON.

**(9) Beneficiary H.L.**

8      48)    H.L.'s residence is 43 miles from MANOR and 40 miles from HUNTINGTON;

9  H.L. (who was assisted by a Vietnamese interpreter) fills prescriptions at VN Pharmacy, located

10  in Garden Grove, and has not had medications delivered.  Medicare billing records report that

11  HUNTINGTON filled JOHNSON prescriptions for H.L. in May 2010.  H.L. stated s/he did not

12  know JOHNSON, has never been to HUNTINGTON, and has never received those

13  prescriptions.  H.L. disclosed, however, that H.L. had been taken to a massage clinic by a

14  Vietnamese man named "Minh" (who H.L. later positively identified as Minh in a photo).  At the

15  clinic, Minh acted as an interpreter and completed all of the paperwork for H.L.  H.L.'s blood

16  pressure was measured and s/he received massages to the head and neck area.  H.L. did not pay

17  anything because his/her Medicare card was used.  H.L. was not prescribed any medications or

18  driven to a pharmacy.  H.L. did not recognize photos of MANOR, HUNTINGTON, or

19  JOHNSON.  H.L. provided Minh's telephone number, (714) xxx-9889, and subpoenaed records

20  have confirmed that this number is subscribed to by Minh.

**(10) Beneficiary Q.T.**

22      49)    Q.T.'s residence is 41 miles from MANOR and 39 miles from HUNTINGTON

23  and fills all prescriptions at Hong Pharmacy, located in Garden Grove; Q.T. (who was assisted

24  by a Vietnamese interpreter) does not receive delivered medications.  Medicare billing records

25  report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH MEDS and FILLER

DRUGS) for Q.T. in February, March, April, and May 2010; Q.T. stated s/he never received those prescriptions.  Medicare Part B records also report that JOHNSON billed, and was paid for, services provided to Q.T. at MANOR in February 2010.  Q.T. disclosed that on two occasions, s/he went to a clinic somewhere in a Los Angeles with an individual named "Minh" (who Q.T. later positively identified as Minh in a photo), and that Minh promised to give Q.T., and each of approximately seven other Vietnamese beneficiaries, $100.  Q.T. also provided Minh's telephone number was (714) xxx-9889, which, as stated above is subscribed to by Minh.  Q.T. said that, at the clinic, the group was herded through the door and a Middle Eastern male (whose name Q.T. did not recall) gave Q.T. an ultrasound and drew blood; Q.T. said there was a different "doctor" each time.  Q.T. did not have to pay anything for the services because s/he used his Medi-Cal and Medicare cards.  Q.T. stated that the process was like an assembly line and that after about an hour, the group was directed to leave out of the back door.  Minh then drove Q.T. home in Minh's van.  Q.T. did not receive or fill any prescriptions and was not taken to a pharmacy.  Q.T. saw groups of Hispanic and African American people at the clinic when he/she was there.  Q.T. did not recognize photographs of MANOR, HUNTINGTON or JOHNSON.

**(11) Beneficiary H.T.**

50)     H.T.'s residence is 45 miles from MANOR and 39 miles from HUNTINGTON and has all prescriptions filled at Ngoc Mai Pharmacy, located in Westminister.  Medicare billing records report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH MEDS and FILLER DRUGS) for H.T. in March 2010.  H.T. (who was assisted by a Vietnamese interpreter) stated s/he never received those prescriptions.  Medicare Part B records also report that JOHNSON billed, and was paid for, services provided to H.T. at MANOR in March 2010.  H.T. disclosed that s/he once went to a clinic (name unknown) in Los Angeles and saw an unknown doctor; H.T. and two or three women from the local senior center were driven to the clinic by a Vietnamese male, whose name H.T. could not recall.  (H.T. was later shown a picture of Minh

31

1   and could not confirm he was the driver as H.T. stated s/he did not get a good look at him.)  H.T.

2   admitted s/he did not have a medical need to go to this clinic, but wanted a field trip to Los

3   Angeles with friends.  At the clinic, H.T. provided his/her Medi-Cal and Medicare cards and

4   received a general examination, by a woman, to check reflexes and throat swelling.  H.T. was not

5   given a prescription or driven to any pharmacies subsequent to the visit and denied receiving any

6   medications at H.T.'s residence.  H.T. did not recognize photos of MANOR, HUNTINGTON, or

7   JOHNSON.[10]

8       **(12) Beneficiary R.S.**

9       51)    R.S.'s residence is 32 miles from MANOR and 33 miles from HUNTINGTON

10  and fills his/her prescriptions at Walgreens.  Medicare billing records report that HUNTINGTON

11  filled JOHNSON prescriptions (for PSYCH MEDS and FILLER DRUGS) for R.S. in March,

12  April, and June 2010.  R.S. did not recognize photos of MANOR, HUNTINGTON, or

13  JOHNSON.  R.S. said several months ago, while standing outside a McDonald's on Alvarado

14  St., across from MacArthur Park, s/he was approached by a Filipino female offering a free

15  medical exam.  R.S. agreed to the exam.  The female directed R.S. to a nearby white, 4-door

16  sedan, driven by an Armenian male who took R.S. and others to a medical clinic approximately

17  20 minutes away.  There, R.S. provided Medicare and Medi-Cal numbers before seeing a doctor

18  who R.S. described as an old white male, possibly Hungarian or Armenian.  The doctor checked

19  R.S.'s reflexes and blood pressure.  The doctor wrote a list of medications on a prescription pad

20  and gave the prescriptions to the driver.  The driver kept the prescriptions and drove R.S. and the

21  other beneficiaries to a nearby pharmacy.  The driver took the prescriptions into the pharmacy

22  and handed them to the pharmacist.  The pharmacist filled the prescriptions and handed R.S. a

23

24

25  ---
[10]  In a previous audit inquiry related to Medicare fraud, discussed below, H.T. confirmed through a mailing questionnaire that JOHNSON was a treating physician but, at the time of the interview, stated that s/he had no knowledge of him.

1  couple of pill bottles.  R.S. recalled keeping a bottle and the driver, who dropped R.S. off at a

2  Blue Line station, kept the others.

3  **(13) Beneficiary N.P.**

4  52)    N.P.'s residence is 43 miles from MANOR and 40 miles from HUNTINGTON

5  and all of N.P.'s medications are filled at Golden Pharmacy, located in Westminister.  Medicare

6  billing records report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH MEDS

7  and FILLER DRUGS) for N.P. in March, April, and May 2010; N.P. (who was assisted by a

8  Vietnamese interpreter) stated s/he never received those prescriptions.  Medicare Part B records

9  also report that JOHNSON billed, and was paid for, services provided to N.P. at MANOR in

10  March 2010.  N.P. disclosed that N.P., along with five or six other Vietnamese people, had been

11  taken to an unfamiliar clinic on two occasions by a Vietnamese male whose name N.P. could not

12  recall.  N.P. could not recall what transpired while at the clinic or if N.P. was taken to a

13  pharmacy, but recalls receiving money on both occasions.  N.P. did not recognize photos of

14  MANOR, HUNTINGTON, or JOHNSON.

15  **(14) Veteran Beneficiary F.O.**

16  53)    F.O. is a veteran who goes to the VA for his medical needs and prescriptions.

17  F.O.'s residence is 15 miles from MANOR, and 26 miles from HUNTINGTON.  Medicare

18  billing records report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH

19  MEDS and FILLER DRUGS) for F.O. in March and April 2010.  Medicare Part B also

20  reports that JOHNSON billed for services provided to F.O. at MANOR in March 2010; those

21  claims were denied.  F.O. stated s/he has never heard of JOHNSON, has never been to

22  HUNTINGTON, and has never received the JOHNSON prescriptions for which his health

23  care was billed.  F.O. did not recognize photos of MANOR, JOHNSON or HUNTINGTON.

24

25

**(15) <u>Beneficiary R.H.</u>**

54)     R.H. relayed through her daughter (who translated Tagalog) that s/he has a primary care physician that is in the same building of the pharmacy where s/he fills all of her prescriptions. R.H.'s residence is eight miles from MANOR and 13 miles from HUNTINGTON. Medicare billing records report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH MEDS and FILLER DRUGS) for R.H. in March and April 2010. R.H. stated s/he has never heard of JOHNSON, has never been to HUNTINGTON, and has not received these prescriptions. R.H. did not recognize photos of MANOR, HUNTINGTON, JOHNSON, or any scheme participants.

**(16) <u>Beneficiary S.P.</u>**

55)     S.P. said s/he uses pharmacies near her/his home in South Los Angeles and s/he has never had medications delivered. S.P.'s residence is eight miles from MANOR and 13 miles from HUNTINGTON. Medicare billing records report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH MEDS and FILLER DRUGS) for S.P. in May 2010. S.P. stated s/he had never heard of JOHNSON (outside of Medicare fraud correspondence), has never been to HUNTINGTON, and has not received these prescriptions. S.P. did not recognize photos of MANOR, HUNTINGTON, or JOHNSON.

**(17) <u>Beneficiary H.C.</u>**

56)     H.C.'s residence is 42 miles from MANOR and 39 miles from HUNTINGTON; H.C. (who was assisted by a Vietnamese translator) stated that s/he fills all prescriptions at Audrey Pharmacy, located in Westminister. Medicare billing records report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH MEDS and FILLER DRUGS) for H.C. in March and May 2010. H.C. stated s/he had never been to HUNTINGTON and has not received these prescriptions. H.C. did not recognize photos of MANOR, HUNTINGTON, or JOHNSON.

**(18) Beneficiary S.A.**

57)     S.A.'s residence is eight miles from MANOR and 17 miles from HUNTINGTON; S.A. fills prescriptions at Wilshire Doux Medical pharmacy in Beverly Hills.  Medicare billing records report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH MEDS and FILLER DRUGS) for S.A. in April, July, and August 2010.  Medicare Part B records also report that JOHNSON billed, and received payment, for services provided to S.A. at MANOR in July 2010.  S.A. stated s/he has never heard of JOHNSON (and did not recognize his photo) and has not received the JOHNSON prescriptions for which S.A.'s health care was billed.  S.A. did not recognize photos of MANOR or HUNTINGTON.

**(19) Beneficiaries A.V and spouse M.V.**

58)     A.V. and M.V. (who were assisted by a Spanish interpreter) live 15 miles from MANOR and 27 miles from HUNTINGTON and they fill their prescriptions at Serra Pharmacy. Medicare billing records report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH MEDS and FILLER DRUGS) for both A.V. and M.V. in March 2010; each stated they never received those prescriptions.  Medicare Part B records also report that JOHNSON billed, and was paid, for services provided to A.V and M.V. at MANOR in March 2010.  Neither recognized photos of MANOR, HUNTINGTON, or JOHNSON.

**(20) Beneficiary V.K.**

59)     V.K. stated that s/he has had the same treating physician for the last three years (not JOHNSON) and fills all medications at ADAMS SQUARE, which delivers to V.K.  Medi-Cal billing records report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH MEDS and FILLER DRUGS) for V.K. in March and April 2010 and that PACIFIC GRAND filled JOHNSON prescriptions (for PSYCH MEDS and FILLER DRUGS) for V.K. in September 2010.  V.K. did not receive these prescriptions nor recognize photos of MANOR, HUNTINGTON, or JOHNSON.

35

**(21) Beneficiary R.A.**

60)     R.A. (who was assisted by an Armenian translator) stated that s/he has used the same pharmacy (Harvard Family Pharmacy) for all prescriptions in the last five years.  Medi-Cal billing records report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH MEDS and FILLER DRUGS) for R.A. in March and April 2010.  R.A. did not receive these prescriptions nor recognize photos of MANOR, HUNTINGTON, or JOHNSON.

**(22) Beneficiary V.G.**

61)     V.G. (who was assisted by an Armenian translator) stated that s/he has prescriptions filled at Well Care Pharmacy, which delivers medications to V.G. once a month. Medi-Cal billing records report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH MEDS and FILLER DRUGS) for V.G. in February 2010.  V.G. did not receive these prescriptions nor recognize photos of MANOR, HUNTINGTON, or JOHNSON.

**(23) Beneficiary G.G.**

62)     G.G. (who was assisted in Armenian by his/her daughter) stated that s/he has prescriptions filled at Werner West Pharmacy, which delivers medications to G.G.  Medi-Cal billing records report that HUNTINGTON filled JOHNSON prescriptions (for PSYCH MEDS and FILLER DRUGS) for G.G. in February 2010.  G.G. did not receive these prescriptions nor recognize photos of MANOR, HUNTINGTON, or JOHNSON.

**(24) Beneficiary L.S. – (billed by PACIFIC GRAND) Identified MENDEZ**

63)     I also participated in the interview of L.S., who as previously stated, was identified during surveillance of MANOR on September 21, 2011.  At the interview, L.S. was identified as the same L.S. who was observed during surveillance on September 21, 2010.  L.S.'s residence, a transitional housing unit, is 12 miles from MANOR and 14 miles from HUNTINGTON.  L.S. stated her doctors were located in Los Angeles.  L.S. was asked if she had been to any other clinic.  L.S. stated that a lady who lives in her building named "Danielle," who

she described as a white female, heavyset, with yellow blonde hair (consistent with MENDEZ's description and with surveillance on September 21, 2010) took her to a clinic on two separate occasions. L.S. stated that MENDEZ took L.S. both times in MENDEZ's vehicle. L.S. was asked if they went to a pharmacy in another van and L.S. denied it, became very, nervous and started sweating. L.S. denied being identified in several photos and became uncooperative. Medicare billing records report that PACIFIC GRAND filled JOHNSON prescriptions (for PSYCH MEDS and FILLER DRUGS) for L.S. in August 2010 and again on September 21, 2010, the date of the surveillance set forth above.

**C.     UNDERCOVER OPERATION**

64)     On January 26, 2011, Cal-DOJ SA Supervisor Sam Masuda received information from another agent that R.T., Pharmacist in Charge at Sunny Bay Pharmacy, located in Arcadia, contacted Cal-DOJ regarding a recent encounter that concerned R.T. Based on the information from R.T., agents conducted an undercover operation into MANOR. Based on my participation in the operation, discussions with other agents, and review of their reports, I know that the following took place:

**(1) <u>L.OVSEPIAN Solicits Sunny Bay Pharmacy</u> (January 25, 2011)**

65)     Having been informed of R.T.'s contact with Cal-DOJ, SA Ramirez contacted R.T. and learned the following.

a.     On January 24, 2011, R.T. received a telephone call from "Lili," who identified herself as a representative of Dr. JOHNSON's office. L.OVSEPIAN stated she was looking for a pharmacy to serve JOHNSON's patients and fill prescriptions for blood pressure, asthma, and diabetic type prescriptions.

b.     Later that day, L.OVSEPIAN and Artak OVSEPIAN (both later positively identified in photographs by R.T.) came to Sunny Bay Pharmacy and met with R.T. L.OVSEPIAN again stated she was looking for a pharmacy to fill JOHNSON's prescriptions for

37

blood pressure, asthma, and diabetic type medications, and she said no controlled substances will be prescribed.  L.OVSEPIAN stated that she could provide an average of 14 patients per day to Sunny Bay.  She stated that JOHNSON's patients are very "picky" about receiving the correct medications and, therefore, the prescriptions needed to be filled in original prescription bottles (i.e., those bottles that come from the manufacture).  L.OVSEPIAN gave the example of a 90-count prescription of Zyprexa (a PYSCH MED), which she said could be left in an original 100-count bottle, with 10 pills removed.  She added that "Izabella," who she identified as JOHNSON's clerical employee, would fax the prescriptions to Sunny Bay in advance and JOHNSON's clinic driver would bring the original prescriptions with the patients to pick up medications.

        c.     R.T. asked L.OVSEPIAN why a Glendale pharmacy was not being used for the patients (as that is where JOHNSON's clinic is located), as opposed to a pharmacy in Arcadia, and L.OVSEPIAN said that she wanted to service patients in the San Gabriel area, and that Sunny Bay had convenient access to the 210 freeway.  L.OVSEPIAN said JOHNSON is contracted with the State to provide good medical service and the last couple of pharmacies have not worked out.

        d.     L.OVSEPIAN presented R.T. with two copies of redacted patients' prescriptions and medical charts to show JOHNSON's work.  L.OVSEPIAN said JOHNSON has four drivers who would bring the patients, and the driver would not always be Artak OVSEPIAN.  L.OVSEPIAN left one copy of the redacted JOHNSON medical chart by mistake.  SA Ramirez later reviewed the medical chart and saw that it reflected a prescription, dated January 18, 2011 and for three refills, for Seroquel (PYSCH MED), and FILLER DRUGS.

### (2) Artak OVSEPIAN Brings Beneficiaries to Sunny Bay (January 25 and 26, 2011)

        e.     On January 25, 2011, Sunny Bay received a telephone call from "Izabella."  Izabella said she would fax a list of medications JOHNSON often prescribes and that

Sunny Bay would need to keep in stock. Sunny Bay later received the fax from "Izabella" and the list included PSYCH MEDS Zyprexa, Seroquel, and Abilify. Later that same day, Artak OVSEPIAN came to Sunny Bay with a beneficiary, who had a JOHNSON prescription for four drugs including a 90-count bottle of Zyprexa (a PYSCH MED).

   f. The next day, January 26, 2011, Artak OVSEPIAN arrived with two more beneficiaries and later returned with two additional beneficiaries. All four beneficiaries presented JOHNSON prescriptions for PSYCH MEDS and FILLER DRUGS. R.T. informed them that the Seroquel and Zyprexa needed to be ordered as Sunny Bay was out of stock. R.T. told Artak OVSEPIAN he could pick the medication up the next day, January 27, 2011. Artak OVSEPIAN said he would check with his dispatch to see if this was agreeable. R.T. saw Artak OVSEPIAN leaving with the beneficiaries in a gray Toyota Camry.

  66) R.T. stated to SA Ramirez that prior to the visit by L.OVSEPIAN and Artak OVSEPIAN, R.T. only kept one 100-count bottle of Seroquel in stock, as it is an expensive medication not commonly dispensed. R.T. stated that, on average, Sunny Bay fills 110 prescriptions a day; with the 14 added beneficiaries that MANOR said they would provide, Sunny Bay would have increased its prescriptions by an additional 60 per day (i.e., an increase of more than 50%).

### (3) Undercover Operation at Sunny Bay (January 27, 2011)

  67) Given the information provided by R.T., the next day, January 27, 2011, BMFEA teams set up surveillance on MANOR and Sunny Bay. SA Masuda acted in an undercover capacity, posing as Sunny Bay's office manager. Based on my participation and having reviewed the reports from other agents, I know the following:

   a. R.T. telephoned MANOR and told "Izabella" that the prescriptions presented the day before were ready to be picked up. "Izabella" informed R.T. that the MANOR driver would likely bring two additional beneficiaries.

b.      Around 12:30 p.m. that day, the MANOR surveillance team observed a grey Sienna minivan (LPN 6NEC582; R/O Armen Ghukasyan) (hereinafter "BENE VAN#3") leave MANOR and arrive at MIDWAY DRUGS.  The driver (an Armenian male) of BENE VAN#3 walked two beneficiaries into MIDWAY DRUGS; each walked in empty-handed and left carrying pharmacy bags.   Thereafter, BENE VAN#3 was observed going to downtown Los Angeles, where the two beneficiaries left empty-handed.

c.      Around 1:45 p.m., the Sunny Bay surveillance team observed Artak OVSEPIAN and a beneficiary arrive at Sunny Bay in a gray Camry.  They entered the pharmacy and presented a JOHNSON prescription for four drugs including the PSYCH MED Zyprexa. The prescriptions were filled and given to the beneficiary in a small blue plastic bag with white edges.  Artak OVSEPIAN was given another bag containing PYSCH MEDS Seroquel and Zyprexa (which R.T. had to order for the beneficiaries brought in the day before), in a separate but same colored bag as given to the beneficiary.  SA Masuda, in his undercover capacity, engaged in a conversation with Artak OVSEPIAN and asked what type of business JOHNSON and MANOR would bring Sunny Bay.  Artak OVSEPIAN told Masuda he would need to speak to "Lili" and took SA Masuda's undercover business card with his cellular number on the back.

e.      Artak OVSEPIAN was seen in the parking lot outside of Sunny Bay looking at the business card SA Masuda provided and making a call on a cell phone. Approximately ten minutes later, SA Masuda received a call from L.OVSEPIAN.  L.OVSEPIAN left a voice message asking for a call back to discuss a future meeting.

f.      Artak OVSEPIAN dropped off the beneficiary, empty-handed, at the Glendale Galleria, and then returned to MANOR.  There, agents observed several unidentified Armenian males waiting at the back parking lot of MANOR, and a black Passat was present with its doors opened.  When Artak OVSEPIAN arrived in the gray Camry, one of the unidentified males walked up to the Camry and returned to the Passat carrying two plastic bags consistent

40

with the Sunny Bay pharmacy bags.  That male then got into the driver seat of the Passat as another of the unidentified males got into the Passat, and the two quickly drove away.

g.      Approximately an hour later, SA Masuda returned L.OVSEPIAN's call at the MANOR Telephone.  The two agreed to set up a meeting between SA Masuda (as the pharmacy manager) and JOHNSON and for a tour of MANOR.  L.OVSEPIAN informed SA Masuda that JOHNSON is only available on Saturdays and after hours.

**(4) Undercover Operation at MANOR (February 8, 2011)**

68)      On February 8, 2011, an undercover operation was conducted at MANOR, wherein SA Masuda (posing as Sunny Bay's manager) wore a hidden recording device and visited MANOR.  Based on my participation, discussions with other agents, a review of the undercover recording and reports from other agents, I know the following.

a.      SA Masuda, along with SA Cindy Niu (also posing in an undercover capacity as SA Masuda's associate) met with L.OVSEPIAN and JOHNSON in an office within MANOR.  Upon meeting with L.OVSEPIAN and JOHNSON, SA Masuda stated that MANOR was a nice clinic and commented that JOHNSON must be seeing a lot of patients.  JOHNSON responded, "Not enough yet, but we're working on it, we're working on it."

b.      L.OVSEPIAN and JOHNSON began discussing their pharmacy needs and SA Masuda stated that he would need to know how much medication to keep on stock. L.OVSEPIAN said they were looking for a pharmacy they "can depend on" and not have to "bug" JOHNSON with "paper work and back and forth faxes."  She continued, stating that they "just wanna work with one pharmacy" that knows JOHNSON, how he works, and understands that "the drivers are picking up patients from facilities."

c.      SA Masuda stated that was one of the questions Sunny Bay had, i.e., why would MANOR not use a pharmacy in Glendale as opposed to one in Arcadia (where Sunny Bay was located).  L.OVSEPIAN stated that they tried other pharmacies but "didn't like the way it

works." SA Masuda asked why and L.OVSEPIAN stated, "It's not us but our patients. . . . Number one, um, patients didn't like the medications that been given them; Number two, they didn't like one of the pharmacists, I don't want to mention the name. . . . they gave two medications, they billed for three." L.OVSEPIAN stated that MANOR had been seeing most of the patients "for more than a year now" and that the patients asked MANOR to review their bills for them to make sure they have not been overcharged by pharmacies. L.OVSEPIAN added that she and "Izabella" therefore review pharmacy bills with patients. Due to these problems, L.OVSEPIAN stated, MANOR is looking for a new pharmacy, one that would have the medications ready for the patients and not have any "attitude." L.OVSEPIAN stated that "Izabella" would be the one to fax prescriptions to the pharmacy.

       d.     SA Masuda asked if JOHNSON typically prescribed anti-depressants and JOHNSON replied, "we see a lot of, uh, patients that are you know like at skilled facilities or assisted living or things like that," and added, "I do physical medicine and rehab . . . and so we do a blend of things here now, while we're trying to build this, uh, so yeah we may continue a lot of these kinds of medications . . . that they are already taking generally prescribed by their primary doctors." JOHNSON said, "that's not my specialty . . . like I'll, may see someone with a stroke and I work on the functional side of it all . . . but uh, that's not my expertise to continue."

       e.     JOHNSON stated that "in another room" he does "acute" "pain management" like "EMG's, nerve conduction studies and all that jazz." JOHNSON offered, "you'll probably never see a narcotic come through here just because you have to have a reason to need narcotic. . . . But, you know, so there may be anti-depressants, uh, sleeping pill . . . but I don't initiate that stuff because I'm not the primary care doc." L.OVSEPIAN added, "We're just collecting patients."

       f.     SA Masuda asked if there were technicians on the premises and JOHNSON said, "yeah technicians here to do that X-ray machines and all uh, that jazz."

JOHNSON stated that in "trying to blend" they were "trying to add another primary care doc who can cover all those things." SA Masuda then asked if JOHNSON was the only medical professional at MANOR and JOHNSON said they have a "PA" who he called "Nora," but otherwise stated he is the only one. SA Masuda asked JOHNSON when he saw patients at MANOR and JOHNSON stated, "I'm here intermittently like evenings, mainly weekends."

g.      JOHNSON then excused himself to go to another facility. The agents continued to talk to L.OVSEPIAN who stated that, in addition to managing the office, she does marketing for JOHNSON had been working with him for a "couple years." SA Masuda asked how often JOHNSON comes to MANOR and L.OVSEPIAN stated "four times a week . . . and Saturday." SA Masuda asked what JOHNSON's specialty is and she stated, "He's uh, neuro-rehab." L.OVSEPIAN also stated that "Nora" is not a "PA" but "the foreign doctor" who sees the patients when JOHNSON is not there but "that's between them." SA Masuda asked for "Nora's" business card but L.OVSEPIAN stated she does not have one as she works under JOHNSON.[11]

h.      L.OVSEPIAN stated that MANOR always keeps copies of the prescriptions so that they know how many have been given to patients. She showed SA Masuda a "follow-up sheet" showing "how many times patients came" and what "pharmacy we are working with." SA Masuda noticed HUNTINGTION listed on the sheet and asked L.OVSEPIAN about it; she stated that they stopped working with them due to "delivery problems." L.OVSEPIAN also stated that most of their patients are from "elderly" facilities and "public social services."

---

[11] A search of the California Board of Registered Nursing, the Department of Consumer Affairs Physician Assistant Committee, and Physician databases revealed that neither N.GRIGORYAN nor any of the MANOR employees outside of JOHNSON are licensed Registered Nurses, Physicians Assistants, or Physicians.

1      i.      L.OVSEPIAN escorted SA Masuda and SA Niu around MANOR to show

2    them the various rooms and equipment.  L.OVSEPIAN introduced I.Ovsepian, and described her

3    as her assistant, the pharmacy contact, and the one who does the scheduling for JOHNSON.

4    L.OVSEPIAN also introduced Arakelyan as MANOR's x-ray technician.

5      j.      L.OVSEPIAN informed SA Masuda that MANOR employed three drivers

6    and she referred to Artak OVSEPIAN (who had previously been to Sunny Bay) as the drivers'

7    manager.   When SA Masuda informed L.OVSEPIAN that Sunny Bay could provide a delivery

8    service, L.OVSEPIAN said she preferred to use MANOR's drivers.

9      k.      SA Masuda asked if Sunny Bay would have any problems with audits.

10   L.OVSEPIAN stated, "we work clean and we're looking for a pharmacy that works clean with

11   us."  She stated that they never had any problems with audits and keep very complete charts.  SA

12   Masuda commented that some of the medications JOHNSON wanted them to keep on hand are

13   very expensive, and he asked how he would know that MANOR would actually have them fill

14   prescriptions for those drugs.  L.OVSEPIAN responded that MANOR has a one-year contract

15   with "a facility" and so they would be seeing patients for at least a year.  She stated that, by then,

16   JOHNSON wants to have hired at least two doctors and then he will be "medical director"

17   because "he doesn't want to work" but rather "come and supervise charts and leave."  She stated

18   that she was thinking about putting an ad on Craig's List for another doctor.

19      l.      When SA Masuda expressed concern about having too many expensive

20   medications in stock, and wondering what Sunny Bay's benefit would be, L.OVSEPIAN stated

21   that MANOR never gives pharmacies "back anything" but, "one thing that I can tell you guys for

22   sure, that you guys gonna have uh, patients."  She stated that the pharmacies they worked with

23   previously were "very happy" because MANOR provides at least 13 to 14 patients a day, each

24   with a three-month supply.  She stated that the patients' charts will note, "follow up within three

25

44

months." She explained, "That's why we give them three months supply, we, we, sort of tell them, just get out of our way and come back in three months."

　　　　　m.　　L.OVSEPIAN stated that I.Ovespian will fax the prescriptions to the pharmacy, and call after the last prescription is faxed. This will give the pharmacy enough time to have the prescriptions ready when the driver arrives with the patients. Then, as L.OVSEPIAN described, "one-by-one, they go, they sign" and the drivers "check everything" before leaving.

　　　　　n.　　The meeting concluded and SA Masuda stated that he would talk to the pharmacist and get back to L.OVSEPIAN.

### (5) Undercover Call to HUNTINGTON (February 22, 2011)

　　　　　69)　　On February 22, 2011, SA Masuda, still posing in an undercover capacity as the pharmacy manager at Sunny Bay, made an undercover recorded call to HUNTINGTON to ask about LIM's prior experience in dealing with JOHNSON and MANOR. SA Masuda identified himself as a pharmacy manager with Sunny Bay Pharmacy in Arcadia and asked to speak with the owner "PK" (LIM).

　　　　　70)　　SA Masuda spoke to LIM and explained that he was considering a future business venture with JOHNSON and wanted insight on LIM's past experience. SA Masuda informed LIM that he learned about HUNTINGTON during his visit with MANOR. In referring to MANOR, LIM stated, "What you see is what they are." LIM stated that he did not have any problems with MANOR but "it's with just the insurance, you know. . . . I mean the clinic is operating is what you see there . . . but with the insurance audit. That's what I'm trying to tell you." LIM explained, "I could not tell any more than this, but they are, to me they are legit; they are practicing what they are, but the problem I have is with the insurance audit." LIM further stated, "Between you and me, you know, I mean all these things are not, nothing illegal. . . . But when they audit they don't see the same thing as we do." LIM stated that the auditors "view

everything suspiciously" and will "just go for the easy target," and stated, "that's why we are very, um, tight bond."

71)     LIM stated he was no longer filling prescriptions for MANOR because of the "insurance audit." LIM said that the audit was "because of Dr. JOHNSON; strictly him." LIM stated that because of the amount of scripts that JOHNSON writes, "they will do audit." LIM stated, "Be cautions on them, that's all I can say. Because of audit."

**D.     ADMINISTRATIVE AUDITS and INTERVIEWS**

72)     Over the course of the investigation SA Ramirez and I have reviewed audit reports and spoken to audit investigators, analysts, and agents about audit investigations conducted on HUNTINGTION and other SUBJECT PHARMACIES regarding JOHNSON prescriptions. I have learned the following information related to such audits:

**(1) Prescriptions Solutions Inc. ("PSI") Medicare (Part D) Audit – (relates to HUNTINGTION, LIM, L.OVSEPIAN, HOVANNISYAN, JOHNSON)**

73)     PSI is a Medicare-contracted provider and oversees Medicare Part D services provided by PSI's contracted pharmacies (including HUNTINGTION).

74)     On April 28, 2010, beneficiary R.E. contacted PSI to report that HUNTINGTION had been filling JOHNSON prescriptions in R.E.'s name that R.E. did not authorize, and, as a result, R.E. could not get his/her legitimate prescriptions filled at his/her own pharmacy. R.E. expressed concern that the billing was fraudulent.

75)     PSI contacted HUNTINGTION and later received a "HIPPA [sic] Authorization Form," signed by R.E., dated April 5, 2010. This form stated that HOVANNISYAN was R.E.'s caregiver and that R.E. authorized to HOVANNISYAN to receive R.E.'s prescriptions from HUNTINGTION.

76)     PSI followed up with R.E., who stated that s/he does not use HUNTINGTION and does not know JOHNSON or HOVANNISYAN. R.E. explained that s/he had been

approached by someone to received free food and, in order to do so, R.E. had to fill out some forms, including that "HIPPA" authorization.

77)     Thereafter, PSI mailed out correspondence to beneficiaries whose Medicare had been billed for JOHNSON prescriptions filled at HUNTINGTION, to verify that they had received such prescriptions.  PSI received 26 responses indicating that the JOHNSON prescriptions billed to those beneficiaries (181 claims, totaling $45,917) were not in fact received by the beneficiaries.[12]  Rachel Seelke, Pharmacy Audit Analyst for PSI also ran billing reports on HUNTINGTION and learned that, from August 2009 to August 2010, JOHNSON was the top prescribing physician (both by amount paid and claim count) at HUNTINGTION.

78)     In July 2010, PSI conducted an onsite audit at HUNTINGTION and in September 2010, Seelke informed LIM that 26 beneficiaries reported that the JOHNSON prescriptions billed by HUNTINGTION were filled without their knowledge or consent, that they had not been treated by JOHNSON, and that they had not gone to HUNTINGTION.  LIM asked Seelke to contact JOHNSON's clinic at (818) xxx-1132 and speak to the office manager "Lili."  LIM stated that he would provide copies of the beneficiaries' driver's licenses and letters, signed by the beneficiaries, giving employees at JOHNSON's office permission to pick up the medications from HUNTINGTION.

79)     Later that same day, Seelke received a call from "Lili Ovsepian" (i.e., L.OVSEPIAN) who identified herself as the office manager of JOHNSON's office. L.OVSEPIAN said she spoke with LIM about the audit and could explain why beneficiaries reported that they had not seen JOHNSON.  L.OVSEPIAN said JOHNSON's patients may not recognize JOHNSON because he is new to the area (from Kansas) and works with a female physician's assistant named "Nora Gregorian" (i.e., N.GRIGORYAN) who sees patients "on occasion."  L.OVSEPIAN also stated that JOHNSON's staff would either deliver the medication

---

[12]  These claims were reversed by PSI pending the results of an independent audit by PSI.

1  to beneficiaries' homes or dispense the medications directly from the office, and, accordingly,

2  beneficiaries may not report having been to HUNTINGTON.

3       80)    On October 16, 2010, Seelke received correspondence from LIM regarding the

4  audit.  In the correspondence, LIM provided 16 retraction statements, purportedly signed by 16

5  of the 26 beneficiaries who reported previously to PSI that that they had never authorized or

6  received JOHNSON prescriptions filled by HUNTINGTION.  The pre-typed statement signed by

7  these beneficiaries read: "*I have been shown and explained to me the signature log of*

8  *medications dispensed by HUNTINGTON PHARMACY and delivered to me by the doctor's*

9  *office.  My denial of receiving the medications was incorrect.  I may or may not recall receiving*

10  *the medications but acknowledge it is my signature*."  For these beneficiaries, LIM also included

11  copies of their driver's licenses, which showed signatures that, according to LIM, matched those

12  on HUNTINGTION prescription logs (captured electronically).  LIM stated that

13  HUNTINGTION required each patient to sign a "HIPPA" [sic] form (enclosed in the

14  correspondence for each of the 26 beneficiaries in question) authorizing a "caregiver" to receive

15  prescriptions from HUNTINGTON.   The caregiver for every beneficiary was identified as

16  HOVANNISYAN (as it was for R.E., as stated above) at 229 N. Central Ave. # 300, Glendale

17  (which I know is MANOR's former address).  The handwriting listing HOVANNISYAN

18  appears to be the same on every form (and different from each beneficiary).

19       81)    LIM stated in his correspondence that the patients who did not sign a retraction

20  statement "may not fully recall receiving medications that were delivered several months ago"

21  but asserted that the signatures on their driver's licenses matched those on prescription logs,

22  showing that they received medications.  LIM also provided that when beneficiaries do not have

23  electronic signatures captured, it is because JOHNSON's drivers signed for the medications

24  when they picked them up at HUNTINGTION, or because L.OVSEPIAN signed for the receipt

25  of medications at JOHNSON's office.  LIM also noted in the correspondence that he and

JOHNSON "have agreed to require all patients to pick up their medications at the pharmacy by themselves since June 2010."

82)  On November 2, 2010, Seelke contacted three of the beneficiaries[13] who signed retracting statements and learned the following:

a.  S.P. stated that s/he never signed a statement retracing S.P.'s previous statement that s/he did not receive the JOHNSON prescriptions filled by HUNTINGTION. S.P. stated, however, that on October 2, 2010, two people came to S.P.'s door asking S.P. to sign a statement indicating that S.P. did not know JOHNSON or go to HUNTINGTON. S.P. said these two people had identification badges on their necks but did not provide a business card. S.P. stated that s/he did not know the caregiver (HOVANNISYAN) listed on the correspondence provided by HUNTINGTION.

b.  N.P.'s daughter J.T. stated that N.P. does not speak English and that J.T. takes care of N.P.'s heath needs and medications. J.T. stated that N.P. only gets medications from Golden Pharmacy in Westminster, and J.T. picks them up. J.T. stated that neither she nor N.P. had been to HUNTINGTON.

c.  R.R. confirmed he had never seen JOHNSON or been to HUNTINGTON, and that he usually gets medications from the VA or Rite Aid in Los Angeles. R.R. stated that s/he did not know the caregiver (HOVANNISYAN) listed on the correspondence provided by HUNTINGTON.

83)  That same day, November 2, 2010, LIM contacted Seelke and Sellke asked LIM how the retraction statements were received. LIM stated that JOHNSON's office sent their drivers to the beneficiaries' homes. LIM stated that the beneficiaries are more familiar with the

---

[13] These beneficiaries were also interviewed by agents in this case, as set forth above. In addition, H.T. and Q.T., also interviewed, as set forth above, purportedly signed retraction statements provided by LIM, but were later interviewed by agents and stated that they had no recollection of signing such statement.

1  drivers than LIM.  LIM asked that Seelke contact JOHNSON, as JOHNSON told LIM that

2  JOHNSON left several messages for Seelke regarding the audit.  Seelke told LIM that she had

3  not received any messages or calls from JOHNSON.

4        84)    The next day, November 3, 2010, "Lili" (L.OVSEPIAN) telephoned Seelke and

5  provided (310) xxx-1495 as JOHNSON's contact number.  Later that day, JOHNSON

6  telephoned Seelke.  JOHNSON said that LIM informed him of the audit and that he was calling

7  to explain why beneficiaries denied seeing him and denied going to HUNTINGTON.

8  JOHNSON said he works with a physician's assistant named "Nora" (N.GRIGORYAN) and that

9  the majority of patients had Dementia, Alzheimer's disease, and other psychosis and might not

10  remember him.  JOHNSON stated that he is a rehabilitation doctor with a general medicine

11  practice.  He stated that, as a convenience to his patients, his office would fax prescriptions to

12  HUNTINGTON and send drivers to pick up the medication.  His office staff would then dispense

13  the medication to the beneficiaries.

14        85)    On November 4, 2010, at approximately 7:50 a.m., "Lili" telephoned Seelke and

15  asked if Seelke had been in touch with JOHNSON, and if the office was going to be audited.

16  **(2) <u>CVS Caremark (Medicare Part D) Audit</u> – (Relates to TRI MED, ADAMS**

17      **SQUARE, PACIFIC GRAND, and WEST VERN)**

18        86)    CVS/Caremark is a Medicare-contracted provider and oversees Medicare Part D

19  services provided by CVS/Caremark's contracted pharmacies (including ADAMS SQUARE,

20  PACIFIC GRAND and WEST VERN).

21        87)    Heidi Haffner, CVS Caremark Manager, Premier Audit Services Pharmacy

22  Performance, provided the following information relevant to this investigation:

23        a.    Haffner is part of audit team who conducts on-site audits of Medicare Part

24  D contracted pharmacies (i.e., CVS pharmacies and a variety of other Medicare Part D contract

25  pharmacies).  Haffner has been an auditor for more than 20 years.

50

b.      Haffner said, in her position, she has identified a trend in organized crime schemes involving the PSYCH MEDS at issue in the instant investigation. Haffner explained that the schemes she has learned of typically involve "younger" persons bringing into small independent pharmacies fraudulently received prescriptions for Medicare beneficiaries. These younger individuals may have identification cards for the beneficiaries so that they can fill beneficiaries' prescriptions without their presence; they also may appear with a group of beneficiaries (transported in a van) who appear to be very low income or homeless. The fraudulently filled prescriptions are typically expensive medications including the PSYCH MEDS and FILLER DRUGS at issue in this investigation. The individuals filling the prescriptions will often ask to receive the drugs in the original bottles and claim that the beneficiaries will only trust the medication if it is in the original bottle.

c.      Haffner has noticed that when she looks into the beneficiaries profiles, she will often see that they receive a few low-cost generic medications at one pharmacy and then claims for brand name PSYCH MEDS (like Abilify and Zyprexa) will appear at a pharmacy that the beneficiary has not previously used. These PSYCH MEDS prescriptions are often refilled at those pharmacies. Haffner believes that this scheme to divert and bill and re-bill for expensive (non-controlled) prescription PSYCH MEDS is easier and more profitable than diverting controlled prescription narcotics, which are subject to more reporting requirements.

d.      Within the last two years, Haffner and other CVS Caremark auditors have noticed that, in response to CVS Caremark audits, some independently owned pharmacies (mostly Russian and Armenian) have started producing invoices showing that their inventory of medications had been purchased from TRI-MED wholesaler. To Haffner's knowledge, CVS Caremark auditors have not received TRI-MED invoices from any other types of pharmacies, such as larger chain retail pharmacies. Haffner and her team began to notice the invoices produced for TRI-MED often appeared to be fake, including because they contain numerous

51

spelling errors.  Haffner said that, based on her more than 20 years of experience as an auditor, most wholesale pharmaceutical invoices are identical in format, but that TRI-MED's are written on a different format using what appears to be a word document format that anyone could create. Haffner said TRI-MED also gave a website www.TRIMEDorders.com, on which she has observed that multiple words were again misspelled.

        e.    Haffner said most large retail pharmacies buy medications directly from large pharmaceutical companies such as HD Smith and Eli Lilly.  These manufacturers ordinarily give the lowest rates for medications.  Accordingly, Haffner questioned why independent pharmacies would buy from a secondary wholesaler such as TRI-MED rather than directly from the drug manufacturers.  Haffner said that she has learned that the TRI-MED website will often advertise discounts on those medications commonly being defrauded, including PSYCH MEDS. For example, Haffner has noticed a 20% discount on the PSYCH MED Abilify posted on the TRI-MED website.

        f.    Based on her belief that TRI-MED was a bogus company used in furtherance of fraud, a CVS Caremark employee visited TRI-MED's listed business address, 1905 Victory Blvd. #15, Glendale, CA.  According to the employee, nowhere on the building did the employee see any signage advertising TRI-MED or any other pharmaceutical wholesaler.

        g.    ADAMS SQUARE Pharmacy was identified as having its Caremark/CVS provider contract terminated.  Caremark received a tip from another Medicare Part D provider that ADAMS SQUARE was submitting suspicious prescription claims from a specific physician and clinic (not JOHNSON or MANOR).  This physician was later interviewed and confirmed he/she had not authorized the prescriptions while briefly working at this medical clinic.  The billings submitted for that doctor's prescriptions were for expensive PSYCH MEDS and FILLER MEDS billed for during the time period of March 2008 through May 2009.  The auditor compared records of the sale of drugs in ADAMS SQUARE with ADAMS SQUARE's purchase

records from medical wholesalers.  The records showed that ADAMS SQUARE was selling more of certain drugs than it was receiving from wholesalers; the drugs included several PSYCH MED such as Abilify and other expensive FILLER DRUGS.  Based on the physician's statement and suspicious audit findings, ADAMS SQUARE's contract with CVS/ CAREMARK was terminated.

h.      Haffner reviewed audit records and said during the audit periods from June 1, 2008 through July 31, 2009, PACIFIC GRAND and WEST VERN Pharmacies reported purchasing medication stock from TRI-MED.  Invoices from TRI-MED to these two pharmacies (provided to Haffner by the pharmacies) report that TRI-MED has sold each of them large amounts of both PSYCH MEDS and FILLER MEDS.

### (3) California DHCS Medi-Cal Audits

#### HUNTINGTON (LIM and KHOU)

88)      On September 21, 2010, HUNTINGTON was the subject of a billing audit by DHCS, as a result of an irregular spike in billing (described above).  When Patricia Moncada (DHCS Health Program Auditor, Medical Review Section) and Sam Kim (DHCS Investigator) arrived at HUNTINGTION, they were met by multiple members of the pharmacy's staff. Moncada provided the staff with a random sample of prescriptions filled by HUNTINGTON (105 specific prescriptions) for which records would need to be produced and copied.  The prescriptions were for the dates January 1, 2010 through July 30, 2010.

89)      Soon thereafter, LIM arrived and immediately provided Moncada and Kim a copy of a legal representation letter dated September 7, 2010.  LIM offered that the reason DHCS were there was because of "Dr. JOHNSON."  LIM stated that he was contacted in early 2010 by a "Lili" (L.OVSEPIAN) from JOHNSONS's office.  "Lili" asked LIM if HUNTINGTION could handle filling a large amount of prescriptions from JOHNSONS's office.  LIM stated that he agreed and later met JOHNSON at JOHNSON's clinic Glendale.  LIM stated that he verified that

the clinic had patient charts and legitimate patients because he (LIM) wanted to make sure that there was no fraud involved.

90)    Moncada asked LIM what services JOHNSON's clinic provided, and LIM responded, "Rehab." LIM did not elaborate, and he then began giving one-word answers that Mocanda described as evasive. LIM said the original verbal agreement between HUNTINGTON and JOHNSONS's clinic was from January through May 2010, during which time JOHNSON would prescribe medications and then HUNTINGTION's delivery driver would deliver these prescriptions to JOHNSON's clinic. JOHNSON's patients would sign a "Confirmation of Prescription Receipt" form that indicated he or she received the medications. LIM said this agreement was good until May 2010, and then LIM required the beneficiaries to come into HUNTINGTON to sign for and pick up the medication. LIM told Moncada that it was then that he had installed an electronic pad used to digitally capture beneficiary signatures. LIM indentified KHOU as a pharmacy technician and buyer, who works on call, part time, and whose hire date was November 2000.

## PACIFIC GRAND and TRI-MED

91)    On November 23, 2010, Grace Britton (Registered Nurse, DHCS, Audit and Investigations Medical Review Branch) provided information to SA Ramirez relating to this investigation.

a.    On November 12, 2010, DHCS conducted an audit of PACIFIC GRAND, located at 501 W. Glenoaks Blvd. Suite 12, Glendale. During the audit, RN Britton only spoke with PACIFIC GRAND's sole owner and president Peter Bagdasarian. Bagdasarian did not allow her to speak to the other employees. RN Britton relayed that Bagdasarian was passive aggressive, including by creating numerous delays when she requested items from him.

b.    According to Bagdasarian, PACIFIC GRAND delivers medications to patients' homes using two drivers, but gave RN Britton only one driver's contact information.

54

1   Bagdasarian said that PACIFIC GRAND maintains delivery logs, however, when RN Britton

2   asked for November 10, 2010 and November 11, 2011 delivery signature logs, Bagdasarian said

3   he did not have them.

4           c.      RN Britton stated that, based on the audit, she learned that PACIFIC

5   GRAND purchases the majority of medications from HD Smith and TRI-MED wholesalers.  As

6   part of the audit, RN Britton requested to see PACIFIC GRAND records for wholesale drug

7   purchases from February 1, 2010 to August 31, 2010, including wholesale supplies, drug sale

8   history, and drug movement report for PSYCH MEDS including Abilify, Nexium, and Zyprexa,

9   and for Advair (a FILLER DRUG) as these were high-volume dispensed medications.

10   Bagdasarian said he did not have these onsite and that he would have TRI-MED fax the invoices

11   to her.  He provided a business card to her with TRI-MED owner Richard Kayseryan's contact

12   information.  RN Britton said Kayseryan later faxed forms to her that she said appeared to be

13   fake because they appeared to have been generated on a word document rather than using

14   formatting generally standard to medical wholesalers.  The invoices listed an address of 52 E.

15   Santa Anita Ave. in Burbank and a website as www.TRIMEDorders.com.

16           d.      Because PACIFIC GRAND dispensed a high volume of the PSYCH MED

17   Abilify, RN Britton asked Bagdasarian to show her where he stores that medication; he pointed

18   to the top shelf that was bare.  Bagdasarian said he often runs out and has to order more drugs

19   everyday; if a prescription was needed, he would go across the street to Pacific Medical

20   Pharmacy and swap medications with them.  Once he received his new medication order then he

21   would return the medications he borrowed to that pharmacy.

22           e.      Britton reviewed 15 prescriptions, 11 of which were issued by JOHNSON

23   for PSYCH MEDS and FILLER DRUGS four beneficiaries (including one for R.A. who has

24   been interviewed by investigating agents, as set forth above).  RN Britton stated that the

25

prescription for R.A. that she reviewed noted "Verified by Seda 7/23/10." I believe this is a reference to Zakaryan, who has been identified in video surveillance as a MANOR employee.

### GAROS

92)     According to Jacqueline Ferratti (DHCS Health Program Auditor) DHCS performed an unannounced audit on GAROS in November 2010 due to the large amount of dispensed suspect medications (i.e., medications identified on the National Medicare Fraud Alert List). DHCS had determined that GAROS'S Medi-Cal reimbursements had doubled from 2008 ($1 million) to 2010 ($2 million). During the audit, a random sample of prescriptions claims were generated for the time period of May 1, 2010 through October 31, 2010 and 42 claims were selected. The medications on the audited claims included PSYCH MEDS (Abilify, Zyprexa) and various FILLER DRUGS.

93)     Ferratti visited GAROS on February 10, 2011 and arrived at 10:00 a.m., but found that GAROS was closed. A sign on the front door indicated regular business hours were 10:30 - 6:30. Ferratti spoke with a neighboring business employee and a UPS delivery driver, both of whom stated that GAROS had been very inconsistent with its hours of operation and is usually only open for a half day. GAROS's owner, Madlen Basilyan, arrived at 11:30 a.m. Basilyn said GAROS opened late because she was sick and had nobody to cover for her. Basilyn stated that GAROS had only five employees with two being drivers, but she did not provide the name for the second driver. During the audit, Basilyan said that GAROS has no contracts with any skilled nursing facilities or any entities and 100% business is walk-in patients and deliveries to their residences through two drivers employed by GAROS. Basilyan estimated 40 beneficiaries have medications delivered to their houses each day.

94)     Basilyan was asked to generate the medication purchasing invoices for the audit period, and Basilyan responded that her computer system was down and that she could not run or generate any tests. When Basilyan was asked for the drug delivery logs for the drivers employed

56

by GAROS, Basilyan responded she did not have them.  Due to Basilyan's inability to provide information, Ferratti ultimately had to make a total of four visits and contacts before all items were produced to complete audit.

95)     On September 23, 2011, I was notified by DHCS Investigator Sam Kim that GAROS closed on Wednesday September 21, 2011.  That day, I visited GAROS and confirmed that it looked closed.  GAROS had a sign posted, stating that all patient prescriptions were relocated to a Walgreens Pharmacy in Pasadena.

96)     On September 27, 2011, I contacted DHCS Audit Manager Thomas Nguyen and DHCS Pharmacy Auditor Scholastica Tang, regarding GAROS's closure.  Tang said GAROS had not returned calls from DHCS relating to the audit findings.  Tang stated that invoices provided by GAROS showing GAROS's stock of specific medications, including PYSCH MEDS (Seroquel and Zyprexa) and other FILLER MEDS, did not support the Medi-Cal claims submitted by GAROS, with a difference of approximately $417,000.  In other words, based on invoices and billing records, it appeared that GAROS was dispensing more of those medications than it was actually obtaining from wholesalers.  I believe this is consistent with GAROS having re-labeled and re-billed the same bottles of PYSCH MEDS and FILLER DRUGS multiple times. Based on my training and experience and discussions with other agents, I know that pharmacies involved in health care fraud, when detected overbilling Medicare or Medi-Cal, will commonly close down to avoid paying back the amounts due and believe that is what GAROS did.

97)     Tang stated that she visited GAROS on September 21, 2011, and noticed an employee moving boxes into his vehicle.  Tang said that while she was taking photographs of the building and the employee's vehicle, the employee interfered with Tang and grabbed her arm. Tang said that the employee followed her into the next door business and took a picture of her using his cellular phone.

### (4) <u>Better Care Pharmacy Audit</u> (Relating to MANOR; L.OVSPIAN)

98)    On December 1, 2010, I met with DHCS Nurse Evaluator Elizabeth Schein and Auditor Amanda January and learned the following:

a.    The State of California performs a pre-enrollment audit prior to approving a Medi-Cal provider.  Schein and January conducted such an audit for Better Care Pharmacy, which applied to be a Medi-Cal provider.  Schein reviewed a number of Better Care's prescriptions written by JOHNSON of MANOR and billed to Medicare.  She thought these prescriptions were odd, because Better Care is in Van Nuys and the patients' addresses generally listed areas miles away.

b.    As part of the audit, Schein went to MANOR in November 2010 to review the medical files on two patients for whom Schein observed JOHNSON prescriptions at Better Care Pharmacy.  At MANOR, Schein spoke with "Lili," who Schein positively identified as L.OVSEPIAN in a CDL photo.  Schein asked L.OVSEPIAN where JOHNSON was, and was told he was not there because it was the day before Thanksgiving.  L.OVSEPIAN told Schein that JOHNSON's regular hours are Tuesdays and Wednesdays from 2:00 pm to 5:00 pm and Saturdays from 9:00 am until the last patient is seen.  Schein received files for two patients but was unable to reach either: one phone number went to the Glendale YMCA and the other number went to an individual who identified himself as the patient's son-in-law, but who hung up on Schein and was uncooperative.  Schein also identified a photograph of A.GRIGORYAN as a man she saw in the back of the MANOR clinic wearing a lab coat.

## E.    CONTINUED SURVILLANCE OF SCHEME

99)    Throughout the investigation, agents and officers have conducted surveillance on MANOR and the SUBJECT PHARMAICES through video and physical surveillance.  Based on my participation, communications with SA Ramirez and other participating agents, and review of reports, I know the following:

58

**(1) January 11, 2011**

100)    On January 11, 2011, the following activities were observed:

a.    A Mercedes Benz (LPN 6DIA684; R/O Nancy Simonian, later identified as the Vice President of WEST VERN) was seen leaving the MANOR parking lot.  An Armenian male later identified as Samvel Khodzhumyan, the manager of a second WEST VERN Pharmacy located in Los Angeles, was seen inside.

b.    BENE VAN#1 and a white BMW (LPN 6GBP234, VIN WBAVA37508NL57292; R/O Maria Manukian at the Artak OVSEPIAN RESIDENCE) (hereinafter "MANOR BMW") drove from MANOR to MIDWAY DRUGS, 19 miles away. There, HARUTYUYAN left the MANOR BMW with several papers in his hand and entered MIDWAY DRUGS.  HARTYUYAN then escorted six suspected beneficiaries from BENE VAN#1 into the pharmacy, one-by-one.  Each time HARTYUYAN and a beneficiary left the pharmacy, the beneficiary was seen holding a white bag.  After HARUTYUYAN and the last beneficiary left, the vehicles were followed to a residential street.  There, HOVINNISYAN and HARUTUYAN got out of the MANOR BMW, and HARUTUYAN retrieved a group of white bags (consistent with the bags carried by the beneficiaries when leaving MIDWAY DRUGS) from the driver of BENE VAN#1.  HARUTYUYAN placed the bags in the rear of the BMW. The BMW drove to MANOR, where HARUTYUNYAN and HOVINNISYAN left the BMW. Agents then observed N.GRIGORIAN leave MANOR in a red Chevy Lumina (LPN 6DEJ735; R/O Elizabet GRIGORYAN) (hereinafter "GRIGORIAN Lumina").  Medi-Cal billing records show that MIDWAY DRUGS submitted 54 JOHNSON prescription claims (totaling $23,478) for six beneficiaries on that day, including prescriptions for PSYCH MEDS and FILLER DRUGS.   Medicare billing records show that MIDWAY DRUGS submitted four JOHNSON prescription claims for one beneficiary that day, including prescriptions for one PSYCH MED and FILLER DRUGS.

**(2) May 19, 2011**

101)   On May 19, 2011, the following activities were observed:

a.      I.Ovsepian arrived at MANOR in the MANOR BMW; N.GRIGORYAN later arrived in the GRIGORYAN Lumina; N.GRIGORYAN was observed several times throughout the day exiting MANOR while wearing a coat consistent with coats worn by physicians.

b.      Numerous suspected beneficiaries left multiple city buses on a corner near MANOR and walked to the back door of MANOR. One of the groups of beneficiaries, escorted by MENDEZ, exited the "603 Grand Street" bus, which I know goes to the downtown area of Los Angeles. MENDEZ appeared to hold a meeting with the majority of the beneficiaries, and a number of them provided MENDEZ with paperwork. SMITH was also seen at MANOR "negotiating" for beneficiaries (i.e., rotating between speaking with the beneficiaries and speaking with MANOR employees). Shortly thereafter, HARUTYUNYAN arrived at MANOR driving BENE VAN#1; he spoke with SMITH and then entered MANOR.

c.      Thereafter, Arakelyan exited MANOR and was observed talking to MENDEZ and beneficiaries. L.OVSEPIAN then arrived in the A.GRIGORYAN BENZ and Arakelyan assisted L.OVSEPIAN in removing bags from the car.

d.      GHUKASYAN arrived in a silver BMW, followed by Artak OVSEPIAN in a gray Camry (LPN 6RIG149, VIN 4T4BF3EK4BR180471; R/O Archak Ovsepian) (hereinafter "OVSEPIAN Camry"). At this same time, six additional beneficiaries exited another bus and walked to MANOR's rear parking lot. Approximately 10 minutes later agents in a parked car across the street from MANOR were approached by GHUKASYAN. GHUKASYAN made a call on his cell phone and appeared to read the license plates on the agents' car and tell the person on the other end of the phone. GHUKASYAN then returned to MANOR and was met outside by HURUTUNYAN. The two then, consistent with counter-

surveillance measures, watched and followed one of the agents as he walked to a nearby convenience store. They both then returned to MANOR. Later that day, both GHUKASYAN and HOVANNSYAN walked down Colorado Blvd. examining vehicles parked on the street, again consistent with counter-surveillance measures.

e.     HOVANNSYAN arrived in BENE VAN#3 and GHUKASYAN, HARUTYUNYAN, and HOVANNSYAN left MANOR with multiple beneficiaries. HARUTYUNYAN was holding paperwork and escorted the beneficiaries to BENE VAN#1 and BENE VAN#3. GHUKASYAN helped load beneficiaries into BENE VAN#3. Both vans departed from MANOR, with HOVANNSYAN driving BENE VAN#3 (with GHUKASYAN as a passenger) and HARUTYUNYAN driving BENE VAN#1. Both vans traveled to MIDWAY DRUGS. During the travel from MANOR to MIDWAY DRUGS the surveillance teams observed multiple acts that were, based on the agents' experiences, counter-surveillance measures. For example, the vans slowed down and sped up on the freeway for no apparent legitimate reason based on the flow of traffic; at one point the vans drove through the same parking lot twice before continuing to MIDWAY DRUGS, and without ultimately stopping in the parking lot.

f.     Once the vans arrived at MIDWAY DRUGS, GHUKASYAN entered holding paperwork, returned to BENE VAN#3, and then, one-by-one, brought three beneficiaries into the pharmacy. Each time, the beneficiary left with a small white pharmacy bag. GHUKASYAN then escorted another six beneficiaries from BENE VAN#1 in the same manner. After the last beneficiary exited, both vans departed MIDWAY DRUGS and conducted what appeared to be more counter-surveillance.

g.     Meanwhile, at MANOR, BENE VAN#2 arrived, driven by Archak Ovsepian. Both Artak OVSEPIAN and Archak Ovsepian loaded beneficiaries into BENE VAN#2 and the OVSEPIAN Camry before departing.

h.      Thereafter, HOVANNSYAN arrived driving BENE VAN#3, with GHUKASYAN as the passenger. GHUKASYAN got out of the van carrying a plastic bag full of small white bags similar to the pharmacy bags received by the beneficiaries that day at MIDWAY DRUGS. GHUKASYAN and HOVANNSYAN entered MANOR with the bag.

i.      HARUTYUNYAN, driving BENE VAN#1, later returned to MANOR. Sometime later Artak OVSEPIAN, driving the OVSEPIAN Camry, also returned. Artak OVSEPIAN pulled out a large plastic bag from the Camry's trunk and took it into MANOR. Approximately a half hour later GHUKASYAN, HARUTYUNYAN, and Artak OVSEPIAN exited MANOR and walked down Colorado Blvd., again examining vehicles parked on the street. GHUKASYAN returned to MANOR and walked to MANOR's back storage area, where he retrieved a large white trash bag. GHUKASYAN then took this bag and placed in the rear of BENE VAN#1 and drove away. Around 9:00 p.m., BENE VAN#1 returned, driven by an unknown person, who parked the van and drove away in the BMW GHUKASYAN arrived in that morning.[14]

j.      Medi-Cal records show that on this day MIDWAY DRUGS submitted 25 JOHNSON prescription claims (totaling $28,085) for four beneficiaries, for drugs including PSYCHS MED and FILLER DRUGS. Medicare records show that MIDWAY DRUGS submitted claims (totaling $4,029) for JOHNSON prescriptions for four beneficiaries, for drugs including PSYCH MEDS and FILLER DRUGS.

t.      Medi-Cal billing records for this same day also show that MERCED MEDICAL submitted 41 JOHNSON prescription claims (totaling $30,148) for 10 beneficiaries; Medicare records show MERCED MEDICAL submitted six JOHNSON

---

[14]     Based my training and experience and on the investigation in this case, I believe that the repeated exchanging of vehicles demonstrates that the targets under investigation avoid driving vehicles registered to them while conducting activities in furtherance of the health care fraud scheme under investigation.

prescription claims for two beneficiaries.  Each beneficiary submitted prescriptions for a PSYCH MED and FILLER DRUGS.

**(3) May Trash Search**

102)  One week following the May 19, 2011 surveillance of MANOR, agents conducted a search of a dumpster placed outside MANOR on the street on Thursdays for collection and seen during surveillance being used by MANOR employees.  The following was discovered:

a.  Numerous patient files were found discarded, in addition to Xerox copies of patient health care cards, California drivers' licenses, and other identification cards.  These Xeroxed cards had handwritten written dates on them which, according to SA Ramirez's review of billing records from MIDWAY DRUGS, matched the then-most recent time that the beneficiaries shown on the identification cards received PSYCH MEDS and FILLER DRUG from MIDWAY DRUGS.   I believe that the dates were recorded to allow MANOR to track the last time JOHNSON wrote a prescription for a beneficiary, so that MANOR can identify when the beneficiary can next refill a prescription under their health care insurance.

b.  Additional evidence located in the trash included more than 30 post-it notes with writing that identified commonly diverted PYSCH MEDS and FILLER DRUGS by milligram and pill count similar to those found on medication price ledgers.  Other post-it notes showed information related to height, weight, blood pressure, temperature and answers to medical questions.

c.  A purchase receipt from MERCED MEDICAL, dated May 25, 2011, at 2:54 p.m., was also found, indicating the filling of 40 prescriptions.  (Video surveillance of MANOR on that date showed Artak OVSEPIAN departing at 2:20 p.m. with numerous beneficiaries.  Medi-Cal and Medicare billing records show that seven beneficiaries filled 16 JOHNSON prescriptions at MERCED on that day).

63

d.      An IDTF-related Nerve Conduction Study "Go By" or pre-template form was also found.  This "Go By" indicates, "You can use any of these three codes," showing how to bill Medicare Part B codes.  Based on my conversations with other agents, I learned that a "Go By" is typically used in falsely submitting imaging claims.  The "Go By" assists schemers in creating notations in patient files that justify ordering imaging tests, which are then billed to Medicare.

**(4) July 19, 2011**

103)    On July 19, 2011, the following activities were observed:

a.      At 2:05 p.m. in the MANOR parking lot, MENDEZ and JONES exited MANOR while talking to Artak OVSEPIAN.  The three of them supervised the loading of beneficiaries into BENE VAN #2 and a white Honda Odyssey minivan (LPN 4RKC608, VIN 2HKRL18511H646640; R/O Gevork Berberyan) (hereinafter, "BENE VAN#4").  Archak Ovsepian then left, driving BENE VAN#2, and an unidentified male drove who appeared to be Armenian or Middle Eastern (UM-1) left driving BENE VAN#4.  Both vans traveled to MERCED MEDICAL and parked one space away from each other.  Thirteen beneficiaries exited the vans and went inside with UM-1.  I entered the pharmacy and observed a female pharmacy employee tell the UM-1 to bring the beneficiaries over to the counter to fill out HIPAA paperwork.  I approached the counter and observed a faxed list with JOHNSON's name written at the top, along with what appeared to be beneficiary names numbered one to 15 written on the sheet.

b.      SA Ramirez then went into the MERCED MEDICAL and overheard the pharmacy worker tell UM-1 that he owed $20.90 for the prescriptions.  UM-1 paid the employee in cash.  Sitting on the counter were three large, white, plastic bags, and inside of each were smaller, white, prescription type bags.  The employee gave UM-1 a long receipt and UM-1 took the bags and receipt and said, "Thank you I'll see you tomorrow."  UM-1 then put the bags in

1   BENE VAN#4.  The beneficiaries loaded up into both vans, none holding any type of

2   prescription bags or receipts.  Both vans then departed MERCED MEDICAL.

3          c.       Approximately fifty minutes later BENE VAN#4 arrived at MANOR.

4   There, UM-1 carried in the three large bags, through the back door.  Around three hours later,

5   L.OVSEPIAN exited MANOR's back door carrying one of the large bags; she took the bag to

6   MANOR's back storage area, unlocked the door and placed the bag inside.

7          d.       Medi-Cal billing records show that on this same day MERCED

8   MEDICAL submitted 58 JOHNSON prescription claims (totaling $43,500), for PYCH MEDS

9   and FILLER DRUGS, for 14 beneficiaries.

10         **(5) July 20, 2011**

11     104)   On July 20, 2011, the following activities were observed:

12         a.       N.GRIGORYAN and L.OVSEPIAN arrived at MANOR;

13   N.GRIGORYAN drove the GRIGORYAN Lumina and entered MANOR carrying a small black

14   roller suitcase, and L.OVSPENIAN drove A.GRIGORYAN BENZ and entered MANOR with a

15   small white dog.

16         b.       Thereafter, MENDEZ and JONES arrived together in a gold Chevy Blazer

17   (LPN 5GOC706; R/O: MENDEZ and JONES) with two suspected beneficiaries.  Numerous

18   other beneficiaries arrived on foot and all entered MANOR through the rear door.  Included in

19   this group was an unidentified individual, believed to be a recruiter, who has been referred to in

20   the investigation as "Camouflage" because he usually wears camouflage-patterned clothing.

21         c.       Eventually, HOVANNISYAN loaded beneficiaries into BENE VAN#3

22   and the MANOR BMW.  Both vehicles then departed.  HOVANNISYAN later returned to

23   MANOR in BENE VAN#3.  HOVANNISYAN removed a large black trash bag from the

24   driver's side seat and took it to MANOR's back storage area.

25

d.      Meanwhile, Archak Ovsepian arrived in BENE VAN#2.  Artak OVSEPIAN left MANOR with nine beneficiaries; four got into BENE VAN#2 with Archak Ovsepian and the remaining got into BENE VAN#4 with UM-1.  Artak OVSEPIAN reviewed some paperwork, and then handed the paperwork to UM-1.  Both vans departed from MANOR and arrived at MERCED MEDICAL.  The beneficiaries entered pharmacy with UM-1.  Archak Ovsepian appeared to be watching and supervising UM-1, in addition to appearing to serve as a look-out by looking at the surrounding vehicles in the parking lot.

e.      SA Keith Hadley entered MERCED MEDICAL and observed UM-1 directing beneficiaries to sign a HIPAA release, after which he appeared to usher out the beneficiaries without any medications.  UM-1 handed an employee what appeared to be prescriptions.  Another employee put approximately 10-15 medications inside individual white bags and then placed those bags into larger white plastic bags and gave them to UM-1.  At no time did MERCED employees review the medications with any beneficiary or ask if they had any questions on the use of the medication.

f.      UM-1 placed the large white bags in the rear of BENE VAN#4.  Both vans left and drove to a Burger King parking lot where the beneficiaries got out of the vans without any bags and were met by MENDEZ and JONES.  "Camouflage" was seen handing cash to at least one of the beneficiaries.  One beneficiary was heard saying to another, "I will see you in a month."  "Camouflage" was overheard talking to a beneficiary about "Psych Meds." Another male approached "Camouflage" and asked a question, to which Camouflage responded, "It's fifty dollars for the red white and blue."  The male reached inside his wallet and pulled out his Medicare card to show "Camouflage" who confirmed, confirmed said, "Yes you get fifty dollars for the card."

g.      Approximately ten minutes following the departure of the two vans from the Burger King, video surveillance showed that BENE VAN#4 arrived at MANOR.  UM-1

66

brought the two large bags identical to those previously seen at MERCED into MANOR.
Several minutes later UM-1 left MANOR empty handed.

       h.     An hour later, six beneficiaries left in BENE VAN#3, with
HOVANNISYAN as the driver and HARUTYUNYAN as a passenger.  Later, the van returned.
At that point, HOVANNISYAN exited the passenger door, walked toward the back storage area,
and returned with a black trash bag like the one he had earlier that day.  HOVANNISYAN stood
at the passenger door of the van and appeared to be speaking with the driver while placing items
into the bag.  HOVANNISYAN then took the bag, appearing fuller, into MANOR.
HOVANNISYAN later exited MANOR's rear door, once again went toward MANOR's rear
storage shed, and returned later with two large black trash bags.

       i.     At approximately 10:50 p.m., L.OVSEPIAN and her small white dog left
MANOR with HOVANNISYAN; L.OVSEPIAN drove away in the A.GRIGORYAN BENZ and
HOVANNISYAN left in a van with a bag.

       j.     Med-Cal billing data shows that, on July 20, 2011, MERCED MEDICAL
submitted 124 JOHNSON prescriptions for PSYCH MEDS and FILLER DRUGS (totaling
$94,270) written for 25 beneficiaries.

**(6) September 20 and 21, 2011**

      105)   On September 20 and 21, 2011, the following activities were observed:[15]

       a.     On September 20, 2011, video surveillance showed approximately 15
beneficiaries arrive at MANOR.  MENDEZ, JONES, SMITH, and "Camouflage" were seen at
MANOR interacting with MANOR staff.  BENE VAN#4 arrived, loaded up with beneficiaries,
and traveled, driven by YEGHIAZARYAN, to MERCED MEDICAL.  There,
YEGHIAZARYAN escorted five beneficiaries inside.  An agent went inside the pharmacy and

---

[15] The Medi-Cal and Medicare billing data for September 20 and 21, 2011 has not yet
been received by investigating agents.

observed the following: each beneficiary signed a clipboard; a pharmacy employee put approximately 10 bottles into a white bag; and YEGHIAZARYAN paid $14 for the entire bag. At no time did the pharmacy staff ask any beneficiaries if they needed any instructions on how to take the medications or if they had any questions.

b.     YEGHIAZARYAN placed the white bag into the rear of the BENE VAN#4 and then drove to downtown Los Angeles where MENDEZ, JONES, and "Camouflage" were waiting. The van unloaded the five beneficiaries and left. MENDEZ approached the beneficiaries and spoke with them. After about five minutes, one of the beneficiaries left with MENDEZ and JONES. "Camouflage" then pulled out cash from his front right pocket and paid each beneficiary. Two of the beneficiaries appeared to negotiate with "Camouflage" for more money. YEGHIAZARYAN returned to MANOR and brought the white plastic bag from the rear of the van into MANOR.

c.     On September 21, 2011, MENDEZ's Blazer was observed at MANOR, with both MENDEZ and JONES inside. MENDEZ and JONES were again observed speaking with multiple beneficiaries. BENE VAN#4, driven by YEGHIAZARYAN, was again observed loading up beneficiaries, overseen by Artak OVESPIAN. The van left and returned around two hours later, without any beneficiaries. YEGHIAZARYAN retrieved a large white bag from the rear of BENE VAN#4 and took it into MANOR.

**(7) Additional Information from Video Surveillance at MANOR**

106)   Based on video surveillance that has been maintained at MANOR and that I have reviewed or learned from other agents' review, I know the following:

a.     Between May 9, 2011 and September 21, 2011, suspected beneficiaries arrived at MANOR and were loaded into vans by co-schemers on approximately 50 separate occasions. These vans would return without beneficiaries within two hours. The driver of the

vans would then retrieve bags from the vans and take them into MANOR or MANOR's rear storage area.

      b.    Between May 9, 2011 and September 21, 2001, JOHNSON has been observed attending MANOR on **only approximately five days** (each time on a Saturday).

      c.    MANOR staff, including HARUTYUNYAN, HOVANNISYAN, GHUKASYAN and L.OVSEPIAN, have, on at least three separate occasions, been observed burning trash taken from MANOR, including black plastic bags removed from the MANOR's rear storage area. Based on my training and experience, I believe that this behavior is consistent with individuals engaged in health care fraud, seeking to destroy evidence of the fraudulent scheme. I am not aware of any legitimate medical clinic or other medical provider that burns documents in this manner.

## F.    CITIZEN COMPLAINT (Regarding MENDEZ and MANOR)

    107)    In March 2011, I was contacted by DEA Diversion Control Program Supervisor Mike Lewis. Lewis said that a citizen informant ("CI") submitted a complaint alleging suspicious activities at a clinic in Glendale, CA. On March 17, 2011, OIG/FDA SA Keith Hadley, SA Ramirez and I interviewed CI who stated the following:[16]

      a.    Approximately one month earlier, while riding the subway to work, a woman identifying herself as "Danielle" (who CI positively identified through a photo as MENDEZ) was recruiting subway riders by stating that they could make $100 dollars by going

---

[16] Based on investigating agents' review of criminal history records, I know that CI: was arrested in 1985 for offenses including the sale of marijuana, providing a false identification of a police officer, assault with a deadly weapon (not-firearm), exhibiting a deadly weapon (non-firearm), battery with serious bodily injury, which were dismissed; was arrested in 1991 arrest for possession of a controlled substance, which was dismissed; sustained a misdemeanor conviction I 1992 for carrying a concealed weapon in a vehicle; has some criminal history relating to California Vehicle Code violations; and has unpaid parking tickets. Nevertheless, I believe the information provided by CI is reliable because much of it has been corroborated throughout this investigation.

to a clinic in Glendale.  While recruiting the riders, MENDEZ asked if they were psychiatry patients.  She told the riders the clinic was near the 7/11 convenience store on Pacific and Colorado (which I know is near the location of MANOR).  She told them to go to the back door and say, "Danielle sent me."  By saying this, MENDEZ provided, "The clinic will know what you need."  Based on my knowledge of the investigation, I know that this behavior is consistent with video surveillance of MANOR, which shows numerous beneficiaries exiting public buses and entering MANOR through the rear door instead of the front door.

    b.  CI works at a plasma center and a number of the patients there have been talking about how to make $100 dollars.  The patients started mentioning a large white woman by the name of "Danielle" (this description is consistent with MENDEZ).  The patients told CI that there is a clinic in Glendale run by an Armenian family, a father and two daughters.  The father, 'Ray' is a driver and his two daughters work inside the clinic, plus there are several Armenian male drivers.[17]  A patient must have Medicare, Medi-Cal, or both to go to the clinic.  At the clinic the patient will fill out some paperwork, and an Armenian female doctor will see/talk to them.  No exam is done and no blood taken.  From the clinic, the patients are loaded into van, driven by "Ray" or one of the other Armenian male drivers and taken to a pharmacy in the San Gabriel Valley.   This pharmacy is owned by an Asian male who will ask each of the patients three questions, then hand the patient a bag of medications.  The patient returns to the van and gives the bag of medications over to the driver.  The patients have no idea what the medications are, and the medications are never kept by the patients.  When all the patients are done, the driver will return them to a bus stop and give them each $100 dollars.  The patients said "Ray" is really nice and sometimes he will even drive them back home.  The patients are advised to come back in three months to repeat the process and make another $100 dollars.  The

---

[17] "Ray" is believed to refer to Archak "Ray" Ovsepian, who is believed to be the father of L.OVSEPIAN and I.Ovsepian. **Error! Main Document Only.**

patients also mentioned that they can sell un-opened medications to the clinic, but the bottles have to be original and in pristine condition.

**G.      TAMAZYAN and N.OVSEPYAN**

**(1)  Search of TAMAZYAN's Car (October 21, 2011)**

108)     Based on my communication with the Glendale Police Department and a review of reports, I learned the following:

a.      On October 21, 2009, Glendale PD conducted a traffic stop on TAMAZYAN because of the car's darkly tinted windows.  At that time, TAMAZYAN told the officer that he had the windows tinted.  The officer asked him to partially roll up one of the windows to examine the tint.  During that time, TAMAZYAN rolled down the back window; the officer then noticed a shopping bag inside the car containing a Ziploc bag filled with pills.  The officer examined the bag, which contained approximately 500 pink and black pills with no marked prescription.  The officer also saw a sealed bottle containing 30 pills of the PSYCH MED Zyprexa with no prescription label.  TAMAZYAN initially told the officer that a doctor, who TAMAZYAN could not identify, authorized him to have the pills to distribute to sick relatives; he later stated that he had collected the pills from leftover medication from friends and relatives.

b.      The officer then asked to search the car and TAMAZYAN consented. Thereafter, officers located miscellaneous patient information forms, another plastic bag with approximately 350 small pink pills marked "Crestor," twenty new syringes, a JOHNSON business card (with MANOR's former address on it), and a piece of paper, appearing to be a ledger, with handwritten numbers and names of medications as follows:

| | | | |
|---|---|---|---|
| Abilify 20mg #30 | - | 1 x | 571.55 = 571.55 |
| Abilify 5mg #30 | - | 2 x | 404.16 = 808.32 |
| Nexium 40mg #30 | - | 4x | 154.83 = 619.32 |

1    Detrol LA 4 mg #30   -        2x    114.67 = 229.38

2                                            2228.57

3                                      1247.99$^{¢}$

4    TAMAZYAN stated he had no knowledge of the paper, although he earlier stated that everything

5    in the car belonged to him.  TAMAZYAN was arrested and, during booking, was found with

6    $950 in his left rear pants pocket, $760 in his left front pants pocket, and $21 in his right front

7    pants pocket.

8              c.      Based on my training and experience, conversations with other agents, and

9    the instant investigation, I believe that ledger found in TAMAZYAN's possession is consistent

10   with a "pay/owe" sheet kept by individuals engaged in the black market diversion of

11   pharmaceutical drugs.  First, two of the drugs noted on the document are PSYCH MEDS

12   (Abilify) and two are FILLER DRUGS (Nexium and Detrol).  Second, the information on the

13   sheet includes the name of the medications, medications strength, pill count, and number of

14   bottles.  Third, an amount for each medication is added and tallied to the right, resulting in a

15   dollar figure.  The first tally is consistent with the Medicare billing rate for the drugs, and below

16   that a number, I believe is the "selling rate" for the drugs (i.e., the black market price, which is

17   often approximately 40 to 50 percent of the billing rate).

18        **(2)  Search of TAMAZYAN's and N.OVSEPYAN's Residence (February 16, 2011)**

19        109)    Based on my communication with the Glendale Police Department and a review

20   of reports, I learned the following:

21              a.      On February 16, 2011, DOJ/BMFEA agents and LAPD detectives

22   executed a search warrant at the residence of TAMAZYAN and N.OVSEPYAN, located at 1745

23   N. Wilton Pl. #1 in Los Angeles.  Both TAMAZYAN and N.OVSEPYAN were present during

24   the execution of the search.

25

b.      Officers found numerous bottles of prescription medications (most without any prescription labels) and loose medication in plastic zip top bags in the kitchen, bedroom, and living areas.  Officers also recovered numerous beneficiary "profiles" (including copies of their CDLs, Medicare, and/or Medi-Cal cards), medication price ledgers, lists of prices for prescription drugs, doctors' prescription pads, and numerous other health care related paperwork. The medication price ledgers included both PSYCH MEDS (Abilify, Zyprexa, and Seroquel), and FILLER DRUGS and were similar to the ledger previously found in TAMAZYAN's car.

c.      While executing the search warrant, officers found a large handbag in the bedroom and brought it to N.OVSEPIAN, who stated it was hers.  Inside, officers found hundreds (i.e., more than 15) of copies of beneficiary profiles, including copies of their identifications and insurance cards, each bearing, among other things, the beneficiary's name, address, date of birth, heath care identification numbers, and signature.  Inside the bag was also a sheet with a prescription label attached, written by JOHNSON for A.K., and listing hand-written names (including A.K.), medications, and the date of July 23, 2010.  SA Ramirez subsequently reviewed Medicare billing data for JOHNSON for July 23, 2010, and found that three of the hand-written names (including A.K.) were billed for JOHNSON prescriptions at GAROS pharmacy.  The name "Nune" is written on several of the copies of beneficiary profiles.  Based on my training and experience and knowledge of this investigation, I believe that N.OVSEPIAN is responsible for those compromised beneficiaries, meaning that she keeps track of when their health care can be fraudulently billed through the scheme.

d.      Searching agents also found a copy of TAMAZYAN and N.OVSEPYAN's 2009 tax records.  Those documents reflect that TAMAZYAN is employed as a "driver" for MANOR (listing MANOR's prior address at 229 N. Central Ave) and that he made $7,800 in that capacity.  L.OVSEPYAN's 2009 tax records were also found. (L.OVSEPYAN is believed to be the niece of TAMAZYAN and N.OVSEPYAN).

Accompanying those records were checks written from MANOR's bank account made payable to L.OVSEPIAN.

e.      In total, more than 300 compromised beneficiary identification sheets were found during the execution of the search warrant.  Agents later interviewed several of them, and all stated that they did not give N.OVSEPYAN or TAMAZYAN permission to possess their identifications.

110)    I conducted a Los Angeles utility check on N.OVSEPYAN on October 13, 2011 and learned that she listed her source of income as Aid for Families with Dependent Children, i.e, government assistance.

## H.      STRUCTURING AND MONEY LAUNDERING (LIM and KHOU)

111)    Based on my discussions with other agents in this case, including IRS SA Cheng Lian and SA Oleg Pobereyko, my review of their reports, and my knowledge of the investigation, I learned the following and believe that it shows that, as part of the health care fraud conspiracy, LIM and KHOU are structuring and laundering funds to conceal and promote the health care fraud scheme:

### (1) Money Laundering

112)    Numerous bank accounts were identified in the names of LIM, KHOU, and HUNTINGTION, to include the following: East West (7236), Chase (0725), Chase (8303), HSBC (0993), and HSBC (7993), each held in the name of name of P.S. Enterprise Inc. d/b/a HUNTINGTION (with LIM listed as President and KHOU as Secretary, both with signatory authority); Chase (2674) and TD Ameritrade (9811), each held in the name of "Phic K Lim & Theana S Khou Family Trust" (and both LIM and KHOU listed with signatory authority); HSBC (9872), in the name of KHOU; and HSBC (2929) and HSBC (0781), in the name of LIM.

a.    In the six-month period from February 11, 2010 to August 26, 2010, Medi-Cal provided HUNTINGTON with 27 reimbursement checks totaling $1,458,902.[18]  Of those, the following three reimbursement checks were deposited into East West (7236):[19]

i.    April 22, 2010: deposit of Medi-Cal check in the amount of $44,733.03, of which $41,963.89 was issued based on claims for prescriptions written by JOHNSON;

ii.    June 4, 2010: deposit of Medi-Cal check in the amount of $39,914.54, of which $34,524.96 was issued based on claims for prescription written by JOHNSON.

iii.    August 26, 2010: deposit of Medi-Cal check, in the amount of $67,152.41, of which $63,845.95 was issued based on claims for prescription written by JOHNSON.

iv.    Thereafter, on August 6, 2010, $165,000 was withdrawn from East West (7236), by a check #1010 written to KHOU "for deposit only" to TD Ameritrade (9811). Similarly, on September 6, 2010, $67,000 was withdrawn from East West (7236), by check #1011 written to LIM "for deposit only" to TD Ameritrade (9811).

b.    The remaining 24 reimbursement checks were deposited into Chase (0725). Between February 17, 2010, and April 23, 2010, multiple checks were drawn on this account and deposited into HSBC (7993).  Twelve of those checks were each for sums of at least $45,000, totaling $1,085,000.  Bank records and subpoenaed invoices show that, from this account, HSBC (7993), LIM then made payments (including for PSYCH MEDS) to two pharmaceutical wholesalers, HD Smith Wholesale Company, Barnes Division, and McKesson Corp.  Based on an interview with an HSBC employee, SA Lian learned that the bank questioned KHOU

[18]    As stated above, from September 1, 2009 to May 1, 2011, HUNTINGTON submitted to Medi-Cal a total of 5,105 claims, billing Medi-Cal $7,768,238.47 (much of which, as indicated by the numbers above, were denied).  Of those claims, 3,929, worth $7,440,929, were from JOHNSON prescriptions.  Therefore, JOHNSON prescriptions accounted for 96% of HUNTINGTON's Medi-Cal billings for this time period.

[19]    I believe, based on my discussions with SA Lian, that these checks were deposited by KHOU, based on the facts set forth within this section demonstrating that KHOU maintained primary control over deposits into HUNTINGTON accounts.

regarding wire transfers from this HSBC account to McKesson; KHOU stated that McKesson is HUNTINGTON's major supplier and that HUNTINGTON makes purchases from McKesson twice a month, each for approximately $200,000 to $250,000.

      c.      Agents in this case have interviewed HSBC employees, who confirmed that they assisted KHOU with banking transactions and stated that, based on their interactions with KHOU, they believe that KHOU handles HUNTINTON's finances and is actively involved in the business.  Indeed, HSBC employees stated that, when the HSBC business account was first opened, an HSBC employee conducted a site visit at HUNTINGTON and spoke with both LIM and KHOU about opening the account.

**(2) Structuring**

      113)    Subpoenaed bank records show that, in just over two months, between August 4, 2009, and October 16, 2009, KHOU made approximately 72 deposits under $10,000 into the HUNTINGTION Chase accounts and HSBC (0993).[20]

      a.     KHOU is believed to be the person making the deposits based on SA Lian's interviews with bank employees.  Specifically, SA Lian has learned that KHOU has stated that she makes all cash deposits on behalf of HUNTINGTON; in addition bank employees have identified KHOU as the person making cash deposits on behalf of HUNTINGTON accounts.

      b.     Many of these cash deposits were made in a structured pattern so as to avoid the $10,000 reporting requirement under federal law; i.e., they were made in the same day, or within a day or two, in amounts close to but under the $10,000 reporting requirement, but that, in aggregate, exceeded $10,000.  For example, bank records show the following cash deposits:

---

[20] During this time period, there were only approximately ten cash deposits in excess of $10,000 made into three of those accounts.

| Date | Cash Deposit | Bank Account |
|------|--------------|--------------|
| August 4, 2009 | $1,662 and $9,000 | Chase (0725) |
| August 5, 2009 | $2,377 and $8,000 | Chase (0725) |
| August 6, 2009 | $2,000, $2,726 and $8,000 | Chase (0725) |
| August 24, 2009 | $9,147 | Chase (8303) |
| August 27, 2009 | $9,500 | Chase (2674) |
| September 8, 2009 | $3,741 and $9,000 | Chase (0725) |
| | $9,000 | Chase (8303) |
| | $7,000 | Chase (2674) |
| September 9, 2009 | $7,900 | Chase (8303) |
| | $2,135 | Chase (0725); |
| September 10, 2009 | $9,180 | Chase (0725) |
| September 11, 2009 | $3,641 | Chase (0725) |
| September 28, 2009 | $9,000 | Chase (2674) |
| | $1,509, $4,000, $4,320 and $5,000 | Chase (0725); |
| October 13, 2009 | $9,000 | HSBC (0993) |
| October 14, 2009 | $9,000 | HSBC (0993) |
| October 15, 2009 | $9,000 | HSBC (0993) |
| October 16, 2009, | $9,800 | HSBC (0993) |

     c.     On October 21, 2009, KHOU was contacted by an HSBC bank employee about the bank's concerns over deposits made at less than $10,000.  At that time, KHOU confirmed for the bank employee that she was aware of the bank's reporting requirements.

KHOU explained that HUNTINGTON generates more than $4,000,000 in sales revenue per year and that a majority of the revenue is in cash. Based on my knowledge of the case, I believe that KHOU provided a false explanation of the cash deposits: during this time period, HUNTINGTON generated a significant portion of its revenue through reimbursements of Medi-Cal, which are provided in the form of a state treasury check, and thus are not obtained in the form of cash.

         d.     Bank records show that, on October 23, 2009, two days after KHOU was contacted by the bank employee, KHOU made a cash deposit into the HSBC (0993) in the amount of $13,000.  Between October 23, 2009, and November 30, 2009, KHOU made five other cash deposits into HSBC (0993), in amounts that exceeded $10,000.  However, during that same period of time, KHOU made six cash deposits into the Chase accounts that remained at less than $10,000.  For example, on November 13, 2009, KHOU deposited $7,825 into Chase (0725).  On November 19, 2009, KHOU deposited $7,300 into Chase account (2674) and $1,433 into Chase account Chase (0725).

         e.     Thereafter, in November 2008, KHOU attempted to withdraw $12,000 in cash from a Wells Fargo account held in her name.  At that time, a bank teller who assisted KHOU informed her that the bank's reporting requirement would be triggered by the deposit.[21]  According to the bank records, KHOU therefore changed her deposit to $9,000.

## I.    TRAINING AND EXPERIENCE

    114)   Based on my training, education, experience, and discussions with other law enforcement officers, I know that:

---

[21] SA Lian contacted the bank teller who later reported this contact with KHOU.  The teller recognized a photograph of KHOU as a customer he assisted, but stated that, because of the time that passed, he was unable to remember specifically what was said.  However, the employee said that Wells Fargo requires its employees, without exception, to inform customers depositing more than $10,000 to visit a government website for additional information about reporting requirements.

a.　　Persons involved in schemes to illegally prescribe, fill, misbrand, bill, and distribute dangerous prescription drugs keep these drugs, proceeds of drug sales and visits, records of drug transactions and other records within their residences and businesses or within ready access, i.e., in their storage areas and vehicles, and conceal such items from law enforcement authorities.  The drugs may be sold or dispensed elsewhere, but documentary records and ledgers often remain.  The records maintained in such cases are kept in both paper and digital form.  Indeed, in large health care fraud schemes such as that at issue in this case, because of the sheer volume of beneficiaries and co-schemers involved, the scale of the fraud, the use of vehicles to transport beneficiaries, and the often disorganized nature of components of the scheme, such documentation will be kept not only in medical offices but also in co-schemers' vehicles and homes.   Moreover, drug diversion and health care fraud is an ongoing and continuing activity, and co-schemers will frequently keep records, documents and other evidence pertinent to their criminal activities at their residences and areas associated with their residences, such as their vehicles, even if they do not keep drugs at those locations, and often for long-term periods.  Such possession was identified in this case, as TAMAZYAN was found in possession of such documentation (e.g., beneficiary identification cards, prescription records, and pay/owe) both in his home and in his vehicle, including records dated months prior to their seizure by law enforcement from his possession.  Moreover, evidence in this case demonstrates that the scheme has continued without breaks from at least the beginning the investigation through the present.

b.　　Those engaged in diversion and health care fraud schemes will maintain drug transaction records, books, account ledgers, payments, "pay and owe sheets," or notes and other evidence of financial transactions relating to obtaining, transferring, and spending substantial sums of money which result from engaging in with the illegal sale,  prescribing, filling, billing, or other distributing of dangerous drugs are often maintained at or in residences, businesses, safe deposit boxes, and storage areas of these persons.  Indeed, such ledgers were

1   found in the possession TAMAZYAN on two separate occasions, as described above, including

2   a large volume of such ledgers during the February 2011 search of his residence.  Moreover,

3   accounting records often will be found in the possession of businesses such as medical clinics,

4   pharmacies, and drug wholesalers, which are necessary for each business's bookkeeping and for

5   keeping track of the substantial quantity of money acquired through the scheme, regardless of

6   whether they conduct legitimate or illegitimate business.

7         c.      Large health care fraud schemes, such as the scheme at issue in this case,

8   often involve the production of a tremendous volume of records.  Indeed, as demonstrated in this

9   affidavit, there is probable cause to believe that MANOR issued thousands of JOHNSON

10   prescriptions, resulting in the acquisition of an extraordinarily large quantity of drugs by co-

11   schemers.  I anticipate that each JOHNSON prescription filled, and each bottle of drugs

12   acquired, resulted in the creation of a substantial quantity of documentation, including patient

13   medical records, copies of prescriptions, invoices for the sale and acquisition of drugs between

14   pharmacies and wholesalers, and in the case of the diversion of the drugs acquired,

15   correspondence, pay/owe sheets, records tracking drugs, and other ledgers.  These records often

16   will be maintained not simply in paper form, but in digital devices such as computers

17   (particularly in the case of patient records and pharmacy/wholesaler records).  Accordingly,

18   because of the thousands of prescriptions at issue in this case and the multiple layers in the health

19   care fraud scheme under investigation, I anticipate that the records (both digital and otherwise)

20   obtained during execution of the requested search warrants will be voluminous.

21         d.      Medical clinics, pharmacies, wholesalers and other offices engaged in the

22   legitimate provision of medical drugs and other goods or services will maintain documentation

23   such as medical charts setting forth records documenting information such as the issuance or

24   filling of a prescription and the medical justification for the prescription.  In California,

25   pharmacists are legally required to retain, for a period of at least three years, all records related to

the acquisition and disposition of dangerous drugs (including PSYCH MEDS), and pharmacies must maintain patient profiles containing the prescription and all identifying information for patients.  Wholesalers generally also maintain these records.  Indeed, the evidence in this case indicates that TRI-MED and the SUBJECT PHARMACIES maintain (or, at least, purport to maintain) such records; during the administrative audits of certain of the SUBJECT PHARMACIES, auditors received purportedly authentic pharmacy records and invoice records from TRI-MED.

e.      Similarly, physicians commonly maintain records including the charts of both current and former patients, in addition to appointment books, sign in sheets, receipt books, billing manuals and instructions, billing records, and financial records.  As set forth above, evidence from the undercover operation in this case indicates that MANOR maintains such records in its premises.  In any event, the absence of records itself constitutes substantial evidence of health care fraud, given that MANOR, the SUBJECT PHARMACIES, or TRI-MED would be in violation of laws and/or professional standards regarding the retention of records concerning the acquisition, prescription and distribution of dangerous drugs such as PSYCH MEDS.  Indeed, those engaged in health care fraud or diversion schemes will often maintain fraudulent records as a means to evade detection.

f.      Those engaged in such schemes also maintain large amounts of currency in their residences and businesses, safe deposit boxes, and storage areas received due to their illegal activities and to use for their other businesses, as well as using currency to pay bills, to acquire assets, and for making other purchases.

g.      Because of the substantial coordination required to carry out complex health care fraud schemes, including the scheme in the instant case, the participants in the schemes maintain frequent and close correspondence with each other, be it electronic or digital correspondence, faxed documents, or other notes.  Those involved in the illegal prescribing,

81

1  filling, billing, and distributing of prescription controlled substances often retain personal and

2  business notes, letters, and correspondence relating to their activities at their residences,

3  businesses, safe deposit boxes and in storage areas, including in digital form.  Such

4  correspondence has been seen in this case, as the foregoing evidence indicates that participants in

5  the scheme such as L.OVSEPIAN, JOHNSON, Artak OVSEPIAN and LIM maintained

6  communication with each other by phone; similarly, MANOR and TRI-MED have listed their

7  email addresses as means of reaching and communicating with them.  To facilitate

8  correspondence with co-schemers, persons involved in the illegal prescribing, filling, billing, and

9  distributing of dangerous drugs generally retain telephone and address books and telephone

10  records identifying additional individuals involved this conduct.

11  **J.      MANOR IS PERMEATED WITH FRAUD**

12          115)    Based on the investigation in this case, as set forth above, I submit that there is

13  probable cause to believe that MANOR is permeated with fraud, that JOHNSON and unlicensed

14  medical practitioner N.GRIGORYAN, as well as MANOR staff, recruiters, and runners, are

15  engaged in a pervasive scheme to defraud the Medicare and Medi-Cal programs and to divert

16  dangerous drugs, and that the evidence of fraud and drug diversion is not segregable from any

17  non-fraudulent activity they may be involved in.  Among other things, this is based on the

18  totality of evidence set forth above, including beneficiary interviews, surveillance, undercover

19  recordings, and billing records, all of which demonstrate the magnitude of the fraud being

20  perpetrated by the MANOR scheme, and which does not demonstrate any legitimate practice by

21  MANOR.  The undercover operation alone revealed the modus operandi of the scheme in

22  recruiting new pharmacies from miles away and ensuring a steady supply of PYSCH MEDS for

23  prescriptions filled from more than a dozen beneficiaries per day.  That undercover operation,

24  together with the surveillance (both video and in-person) of "cappers" and "runners,"

25  demonstrate the scale, sophistication, organization and daily continuing operation of the scheme.

1    Moreover, while L.OVSEPIAN has represented that JOHNSON works at MANOR four days a

2    week, surveillance in this case has demonstrated that JOHNSON rarely visits MANOR;

3    beneficiary interviews have confirmed that those beneficiaries who are taken to MANOR do not

4    see JOHNSON but rather see (if anyone) other co-schemers such as N.GRIGORYAN and

5    L.OVSEPIAN posing as physicians.

6        116)   While MANOR advertises itself as a business engaged in legitimate medical

7    diagnostic imaging, evidence obtained in this case demonstrates that even that billing is

8    fraudulent and that no such service is legitimately performed.  There has been approximately

9    $128,000 billed by MANOR for Medicare Part B IDTF-related diagnostic imaging tests during

10   the course of this investigation, only a small portion ($20,766) of which was paid.  As explained

11   in this affidavit, through beneficiary interviews and comparing the Part B IDTF billing records, I

12   know that of the beneficiaries interviewed, MANOR has submitted IDTF-related claims for only

13   11, primarily for nerve conduction treatment and duplex scans; however, none of the

14   beneficiaries interviewed in this case reported actually receiving such services.  Further, for

15   some of the interviewed beneficiaries, MANOR submitted Part B IDTF-related claims that did

16   not correlate to when the beneficiaries filled JOHNSON prescriptions, indicating that the Part B

17   billing submitted by MANOR on behalf of those beneficiaries was fraudulent.  MANOR has not

18   billed Medicare Part B for any IDTF-related services since November 2010 and has submitted no

19   IDTF-related services to Medi-Cal during the entire course of this investigation.  Despite this

20   lack of billing, L.OVSEPIAN represented during the undercover operation on February 8, 2011,

21   that MANOR's patients are mostly elderly and low-income individuals with public health care

22   benefits.  Moreover, as discussed above, a trash search at MANOR revealed a "Go By"

23   document that is commonly used to facilitate the submission of fraudulent Medicare Part B IDTF

24   claims.

25

## K.    ADDITIONAL INFORMATION REGARDING RESIDENCES

117)    <u>JOHNSON RESIDENCE</u>:  Based on an October 8, 2011 interview of a resident who resides in a home adjacent to the JOHNSON RESIDNECE, in addition to information obtained from the United States Postal Service in October 2011 (including an interview with the mail carrier for that property and a change of address form submitted by JOHNSON dated September 21, 2011), and utility records obtained in October 2011 for that property, I know that JOHNSON currently resides at the JOHNSON RESIDENCE.

118)    <u>OVSEPIAN RESIDENCE</u>: Based on surveillance in October 2011 (including the morning October 20, 2011, when L.OVSEPIAN was seen on the premises of the OVSEPIAN RESIDENCE); records obtained in October 2011 from the DMV regarding L.OVSEPIAN's driver's license and vehicle registration; subpoenaed bank account records obtained in October 2010; L.OVSEPIAN's 2009 tax records obtained during the February 2011 search of TAMAZYAN and N.OVSEPIAN's residence; information obtained from the United States Postal Service in December 2010; and records recovered in this case during trash searches, which show L.OVSEPIAN's name and home address as the OVSEPIAN RESIDENCE, I know that L.OVSEPIAN currently resides at the OVSEPIAN RESIDENCE.

119)    <u>Artak OVSEPIAN RESIDENCE</u>: Based on surveillance in October 2011 (including the morning of October 20, 2011, when Artak OVSEPIAN was seen on the premises), records obtained in October 2011 from the DMV regarding Artak OVSEPIAN's driver's license and vehicle registration, I know that Artak OVSEPIAN currently resides at the Artak OVSEPIAN RESIDENCE.

120)    <u>LIM and KHOU RESIDENCE</u>:  Based on surveillance in October 2011 (when LIM and KHOU were seen on the premises), information obtained from the DMV in October 2011 regarding LIM and KHOU's driver's license and vehicle registration records, mortgage account information and escrow documents for the property obtained in July 2011 showing that

LIM and KHOU own the property), SA Ramirez know that LIM and KHOU currently reside at the LIM and KHOU RESIDENCE.

121)   HARUTYUNYAN RESIDENCE:  Based on surveillance in this investigation (including in May 2011, when HARUTYUNYAN was seen on the premises), DMV driver's license and vehicle registration records for HARUTYUNYAN obtained in October 2011, and utilities records obtained in October 2011, I know that HARUTYUNYAN currently resides at the HARUTYUNYAN RESIDENCE.

122)   GRIGORYAN RESIDENCE:  Based on surveillance in August 2011 (during which N.GRIGORYAN was seen at the premises), a review of an apartment directory in the common area of the premises, DMV driver's license and vehicle registration records for N.GRIGORYAN obtained in October 2011, and subpoenaed bank account records for accounts belonging to N.GRIGORYAN obtained in November 2010, I know that N.GRIGORYAN currently resides at the GRIGORYAN RESIDENCE.

## L.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

123)   As used below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes used to store digital data (excluding analog tapes such as VHS), and memory chips; and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of the premises it is not always

possible to search digital devices for digital data for a number of reasons, including the following:

      a.     Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, software application or operating system that is being searched.

      b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

      c.     The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 240 million pages of data, that, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 GB drive could contain as many as approximately 450 full run movies or 450,000 songs.

      d.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet.

Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.

        e.      Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or

edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment.

      f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment.

      g.    As set forth in this affidavit, there is substantial evidence indicating that digital evidence will be commingled with a potentially substantial quantity materials not related to the health care fraud scheme under investigation, such that off-site review is necessary and appropriate pursuant to <u>United States v. Tamura</u>, 694 F.2d 591 (9th Cir. 1982).  I believe that the SUBJECT PHARMACIES fill prescriptions for doctors other than JOHNSON, and that TRI-MED provides (or, at least, purports to provide) medications for the SUBJECT PHARMACIES

88

that were used to fill prescriptions for doctors other than JOHNSON.   Accordingly, evidence within the scope of the search warrant seized from those pharmacies likely will be commingled with materials related to those other prescriptions and to the acquisition of drugs (if any records in fact exist at TRI-MED) used to fill those prescriptions.  As to MANOR, while I believe that MANOR is permeated with fraud, I anticipate that agents will obtain a tremendous volume of evidence (digital and otherwise) during the search of MANOR, and that much of the evidence will be in the Armenian language.  For example, during trash searches at MANOR, agents found a large volume of materials written in the Armenian language, and agents on surveillance have overheard the targets under investigation speaking with each other in that language. Accordingly, off-site review will be necessary to translate materials and to determine which of the materials fall within the scope of the items to be seized under the requested warrant.

     i.  The United States has not attempted to obtain this data by other means.

   124) In searching digital data stored on digital devices at the SUBJECT PHARMACIES, law enforcement personnel executing this search warrant will employ the following procedure:

     a.  The physical search of the premises will be conducted by law enforcement agents who are investigating the crimes described in the affidavit (the "investigating agents"). Upon securing the premises, these investigating agents will, if they can do so without reviewing the contents of the digital data contained on any digital device, seek to determine if the digital device contains data falling within the scope of the items to be seized under this warrant.  If, without reviewing the contents of the digital data contained thereon, the investigating agents can make the determination that a digital device contains data falling within the scope of the items to be seized under this warrant, that digital device will be seized.  In attempting to determine whether any digital device contains data falling within the scope of the items to be seized as

described in this warrant, the investigating agents will not review the digital contents of any such device or any indexes or summaries thereof.

b.    If the investigating agents conclude that they cannot make the determination that a digital device contains data falling within the scope of the items to be seized under this warrant without reviewing the contents of the digital data contained on the digital device, the investigating agents will consult with law enforcement personnel and/or others aiding law enforcement personnel and acting at their direction who are not involved in the investigation of the crimes described in the affidavit (the "filter team").  The filter team will include law enforcement personnel and/or others aiding law enforcement personnel and acting at their direction specially trained in searching, seizing, and segregating digital data (the "computer personnel").  The filter team will be consulted (either on-site or off-site) and will, in its discretion, either search the digital device on-site or seize and transport the device to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    Following a seizure of a digital device pursuant to subparagraphs (a) or (b) above, the filter team will conduct the search of the digital device by using search protocols specifically designed to identify items to be seized under this warrant.

i.    The filter team may examine all of the data contained in the digital device capable of containing items to be seized as specified in this warrant to determine whether the data falls within the items to be seized as set forth herein.  The filter team may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

ii.    The team searching the digital device also may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

d. When searching a digital device pursuant to the specific protocols selected, the team searching the digital device shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

e. If the filter team searching a digital device pursuant to the selected protocols encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that digital device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f. The filter team will not disclose to this affiant or any other investigating agent, or any Assistant United States Attorney involved in this investigation, any data contained on the digital device other than that which is seized as falling within the scope of the items to be seized under this warrant except with prior Court authorization. The filter team may disclose to this affiant and any other investigating agent any data contained on the digital device that is seized as being within the scope of the items to be seized under this warrant without further order of the Court.

g. The filter team will complete its search of the digital device as soon as is practicable but not to exceed 60 days from the date of execution of the warrant. If additional time is needed, the government may seek an extension of this time period from the Court within the original 60 day period from the date of execution of the warrant.

h. If the search determines that the digital device does not contain any data falling within the list of the items to be seized pursuant to this warrant, the government will return the digital device and delete or destroy all the forensic copies thereof.

i. If the search determines that the digital device does contain data falling within the list of the items to be seized pursuant to this warrant, the government will either (i)

within the time period authorized by the Court for completing the search, return to the Court for an order authorizing retention of the digital device; or (ii) retain only a copy of the data found to fall within the list of the items to be seized pursuant to this warrant and return the digital device and delete or destroy all the forensic copies thereof.

## VII.  CONCLUSION

125)    Based on the foregoing, I submit that there is probable cause to believe that the SUBJECT PREMISES set forth in Attachments A-1 through A-14 contain evidence, fruits and instrumentalities of criminal violations as set forth in Attachments B-1 through B-14.

126)    Based on the foregoing, I also submit that there is probable cause to arrest A.GRIGORYAN; L.OVSEPIAN; JOHNSON; N.GRIGORYAN; HARUTYUNYAN; Artak OVSEPIAN; LIM; KHOU; HOVANNISYAN; GHUKASYAN; MENDEZ; JONES; SMITH; YEGHIAZARYAN; WASHINGTON; TAMAZYAN; and N.OVSEPYAN for violations of 18 U.S.C. § 1349 (conspiracy to commit health care fraud).

_____
/s/

Laura Wilbur
Special Agent
California Department of Justice

Subscribed and sworn to before me
this _____ day of October 2011.

CARLA M. WOEHRLE

_____
HON. CARLA M. WOEHRLE
UNITED STATES MAGISTRATE JUDGE